Ruffin, C. J.
 

 It is not usual for the court to discuss evidence in detail; and, to every one conversant with the proofs in this cause, the reasons will be obvious, why we should decline it upon this occasion. It is sufficient to state its effect to be fully to sustain, and even more than sustain, the statements in the bill. Upon the questions of fact there is not the slightest doubt. There is a vast mass of depositions ; and all of them, including even those ol the defendant, and we may almost say the answer too, taken as a whole, establish -iaeentestably the want of -capacity in this
 
 *95
 
 woman to make any contract, or do any act requiring reason. From the birth of the last child of the first marriage, she was subject to frequent fits oí lunacy. The paroxism became more and more frequent, and more and more violent, until her reason seems almost to have become entirely extinguished, leaving, however, her bodily health good and her sensual appetites inflamed and uncontrolled. Her moral principles and sentiments declined with the decay of her mental faculties. Once a well- bred and virtuous young woman and then an exemplary matron, she soon lost, after these attacks, the characteristic delicacy of her sex, and seemed literally to be possessed with'a firry of animal passion. With a view to its gratification, she constantly, forgetful or insensible of the death of her husband, invoked his return. She was considered and treated by all as an insane person, and she acted as if she was always insane. She conducted no household affairs, performed no maternal duties, professed no maternal affections-. No one gives the particulars of a single rational and connected'conversation sustained for a moderate length of time. The answer states that she had lucid intervals, and that in oue ef them she was courted and married by the defendant. But no one else thought she was then of sound mind, though not reduced to a state in which her mind was so extinguished, as to- present to a stranger the idea of never having,had any. The-courtship and marriage may, under the circumstances, be called acts of madness in themselves and must satisfy any one that the defendant was fully aware of her state. Not one word appears ever to have been exchanged between these persons, until the hour of their engagementand their ages and conditions in life were also unsuitable. The subsequent indecent hurry iu having the ceremony performed and the reasons for it, as admitted in the answer are perfectly convincing of the views the defendant and his family took of her state. It is true, restraint is denied ; but even in that, the case is proved to be otherwise. Mrs. Palmer went for Mrs. Crump ; but was refused access to her and could only see her through the window of a room, in which she was
 
 *96
 
 shut up. That lady sent immediately to Mr. Harris to advise him of her suspicions, and he hastened to the scene of action, but did not arrive until the marriage had been just concluded. But a circumstance then occurred, that leaves no doubt of her want of reason at the time. In the moment of taking a second husband, she invoked the return of the first: “ I wish” — she said — “the Colonel would come.” It is true this person was not always in a phrenzy. But though sometimes calmer in her passions than at other times, she has never been sound in her mind since 1837, at the nearest. Her reason has never existed in its integrity, for even the shortest intervals, as far as we can discover.
 

 Indeed the case was not much contested on the fact of insanity ; but the defence was placed on certain legal positions, which will now be considered. It was contended with much zeal, that the relief cannot be granted, because the marriage of a lunatic is valid in law. There is no doubt that at one period such a notion of the common law was entertained. Perhaps it was an instance of the absurd rule, that a person should not be allowed to stultity himself; or, perhaps, according to the conjecture expressed by Sir William Scott, in
 
 Turner
 
 v
 
 Meyers,
 
 1 Hogg. C. L. 414, it might have been founded on some notion of marriage being a sacrament, and thence deriving a spiritual obligation, independent of the acts of the parties. But, to whatever the rule may have owed its origin, we must at this day feel astonishment that it should ever have existed, and say with the great commentator, “ a strange determination ! since consent is requisite to matrimony.” 1 Blac. Com. 438. This court has recently held,
 
 Johnson
 
 v
 
 Kincade, 2
 
 Ired. Eq. 470, that the marriage of an idiot is void, and gave a sentence of nullity. The principle is equally applicable to the marriage of a lunatic ; and we should consider that case a conclusive authority in this, had the question been then argued. Indeed, we then considered the point as one so little open at this day, that we only referred to the passage in Blackstone and the single adjudication of Sir William Scott, in support of the opinion. We have
 
 *97
 
 therefore heard the argument of the question in the present case, and, after doing so, our reflections only confirm our first opinion. In
 
 Browning
 
 v
 
 Reane, 2
 
 Phill. 69, Sir John Nichol said, “ the want of reason must invalidate a contract and the most important contract of life, the very essence of which is consent.” It is not material, whether the want of consent arises from idiocy or lunacy, or both combined ; for, if the incapacity be such, arising from either or both causes, that the party is incapable of understanding the nature of the contract itself, and incapable, from mental imbecility, to take care of his or her person and property, such a one cannot dispose of his or her person or property by the matrimonial contract, any more than by any other contract. The case of
 
 Turner
 
 v
 
 Meyers
 
 was one of lunacy, brought by the husband after his recovery. Sir William Scott cited three cases : that of
 
 Morrison,
 
 before the delegates in 1745, which is quoted by Blackstone as his authority ; that of
 
 Parker
 
 v
 
 Parker,
 
 before the Consistory Court of London in 1757 and since reported in
 
 2
 
 Lee, 382; and
 
 Cloudesley
 
 v Evans, in the same Court in 1763 ; as having fully determined, that marriage, like other civil contracts, is invalidated by want of consent of capable persons. He said, that in those cases all the old
 
 dicta
 
 were brought before the courts; and he took it to be as clear a principle of law at that day (1808) as any could be, and as incapable of being affected by any general
 
 dicta,
 
 which may be found in writers of earlier periods, as any
 
 fundamental maxim,
 
 on which the courts are in the habit of proceeding; and he pronounced the marriage null. A like sentence was given by Sir John Nicol in
 
 Lord Portsmouth’s
 
 case; the husband being of weak mind and the weakness being to such a degree, that the party was pronounced not of sound mind sufficient to enter into that contract. And in the same case the opinion of the chancellor was given, as it has often been in other cases, in support of the principle, by directingthe committee to prosecute proceedings for declaring the marriage void on the ground of the lunacy.
 
 In re, the Earl of Portsmouth, August
 
 23d, 1824. Shelford on Lit
 
 *98
 
 natics, 449. In the case of
 
 Parker v Parker
 
 the question was entertained, after the death oí one of the parties, upon an application for administration. Sir George Lee did 'j10t hesitate to go into the enquiry of fact; clearly intending, if be found the lunacy, to pronounce the marriage null and refuse administration to the widow. But he found capacity and pronounced fo.r the widow’s interest, but the case of
 
 Browning
 
 v
 
 Reans,
 
 2 Phill. 69, is a similar one, in which Sir John Nicol found the lunacy, and, after making the observations before quoted, he pronounced against the marriage and refused the administration.
 

 But it was argued that these adjudications grew out of the Act of 15th Geo. 2, c. 30. But that is impossible. The act is not alluded to in them. Moreover it has no application to the cases. It does-not enact that the marriage of lunatics shall be void. It assumes that they are; and, to prevent mischief from an uncertainty as to the capacity of one, who has been of unsound mind, ascertained judicially by inquisition, it enacts that the marriage of such a person shall be void, though of sound mind at the time, unless he or she may have been so declared by the chancellor and the commission superseded.
 

 Again it was said, that these are the adjudications of the Ecclesiastical Courts and are founded, not on the common law, but on the canon and civil laws, and therefore not entitled to respect here. But it is an entire mistake to say, that the canon and civil laws, as administered in the Ecclesiastical Courts of England, are not parts of the common law. Judge Blackstone, following Lord Hale, classes them among the unwritten laws of England and as parts of the common law, which by custom are adopted and used in peculiar’ jurisdictions. 1 Bl. Com. 79. Hale’s His. Com. Law. 27, 32. They were brought here by our ancestors as parts of the common law, and have been adopted and used here in all cases, to which they were applicable, and whenever there has been a tribunal exercising a jurisdiction to call for their use. They govern testamentary causes and matrimonial causes. Probate and reprobate of wills stand upon
 
 *99
 
 the same grounds here as in England, unless so far as utes may have altered it.
 
 Dickinson
 
 v Stewart, 1 Mur. 99.
 
 Ward
 
 v
 
 Vichars, 2
 
 Hay. 164.
 
 Redmond v Collins,
 
 4 Dev. 430. Divorce causes fall within 'the same category, upon the conferring of the jurisdiction; which must be emphatically true upon the enactment, that-the Court should not only grant divorces for certain specified causes, but “for any other just cause,” thus giving no guide to our discretion but the lights to be derived from our ancestors in the like cases. We remark, in conclusion, that in not one of the cases cited did the judge profess to found his sentence of nullity On the civil and canon laws, as distinct from the common law, or that the principle was peculiar to that part of the common law, which owed its origin to those laws. On the contrary, the reasoning throughout is, that marriage is not, as was once supposed, an exception, by forcé of the canon law, to the principle of the common law, which makes contracts invalid for the want of mental capacity. It is the common law itself, which authorizes and requires the modern decisions of the Courts, in opposition to some of the
 
 dicta
 
 of elder text writers. In that light is the subject viewed by Chancellor Kent in the case of
 
 Wightman v Wightman,
 
 decided in 1820, 4 Johns, ch. ca. 343. So we also considered it in
 
 Johnson
 
 v Kincade; and we have no doubt, that, by the common law of England as held in that country for a century, as we know, and probably much longer, and not denied by any adjudication by any Court, as far as can be traced for four or five centuries, a marriage of a lunatic is void, and must be so pronounced by every Court, to which, and in every form in which,- the subject can be presented. And, besides, a statute gives the general jurisdiction here, and, acting under it, we cannot hesitate to say, that it is against reason, that one without reason should be held to have made a binding contract.
 

 But it was further said at the bar, that there was evidence, from which lucid intervals, for at least short periods since the marriage, might be inferred, and that amounts to confirmation. A writer upon the law of mariage lays it down,
 
 *100
 
 that when a marriage is void
 
 ipso facto,
 
 acquiescence, cohabitation and issue, or the desire of the parties to adhere, cannot amend the original defect. Paynter on mar* rjage an(j 157. jn a case 0f al]eged insanity at the time of the marriage, subsequent acquiescence, during long or frequent periods of undoubtedly restored reason, would be cogent proof of competent understanding at the time of the marriage; but, assuming lunacy then to have existed, the rule of the author quoted seems to be sustained by the consideration, that marriage is a peculiar contract, to be celebrated with prescribed ceremonieSj and, therefore, subsequent acts, not amounting in themselves to a marriage, will not make that good which was bad in the beginning. But we do not propose to lay down such a rule in this case; for we are clearly of opinion, that, at no time since this marriage, has this person been so in possession of her faculties, as to be capable of judging of her rights or interests, or of making or confirming a contract.
 

 The Court was next asked to refuse to annul the marriage as a matter of discretion, as being best for all parties, under existing circumstances. If the Court conld treat it as a case of discretion, the present is, certainly, not one for the exercise of the discretion by 'leaving this person and her property in the power of the defendant, whose motives and conduct from the beginning to the end have been most flagitious. But we have no such discretion as will enable us, on the hearing of the cause, to refuse the decree, if the party can legally demand it. The committee usually apply to the chancellor for directions upon this; as upon other subjects involving the expenditure of the lunatic’s estate, and after an enquiry whether it is proper any steps should be taken to avoid the marriage of one found to .be a lunatic, it is ordered accordingly. Before the master or before the Chancellor, objection will be heard on this proceeding from any person in interest; and one may be heard on a motion to discharge the order or supersede the commission. The question would thus be made distinctly and decided on the proper evidence and facts, But when the cause has been regularly
 
 *101
 
 instituted, the Court cannot refuse to entertain it. On the hearing the decree must be granted, if the pleadings and proofs authorise it; and the Court cannot allow, in this stage of the cause, the merits to be embarrassed by having other questions complicated with them.
 
 Parnell
 
 v
 
 Parnell, 2
 
 Phill. 158.
 

 Lastly, objection was taken to the form, in which this suit is brought, being in the name of the supposed lunatic by her committee; whereas, it is said, it should be in the name of the committée alone. The authority for the position is a passage in a treatise on the law of
 
 non compotes
 
 by Mr. Stock, p. 20; for which is cited
 
 Lord Portsmouth's
 
 case, 1 Hay. Ec. Rep. 356. We do not doubt that a suit for nullity may in England be brought by the committee in his own name alone; for, in the Ecclesiastical Courts any party in interest, though a third person, as a committee of a lunatic, or one claiming an estate in remainder after failure of issue, may institute such a suit or may intervene in it, as Mr. Chilly states, 2 Genl. Prac. 460. It may be noticed in passing that he adds, that in general there should, for greater security, whilst the parties and witnesses are living, be a sentence in the ecclesiastical courts, though the marriage be absolutely void, as in the case of iunacy. But to the point under consideration; it appears, that, from the nature of the jurisdiction of the Ecclesiastical Courts, which is in rem or on the
 
 status
 
 of the person, the committee alone
 
 may
 
 institute proceedings to annul the marriage of the lunatic. That, we think, is all that is meant, when it is said the committee is a proper party; for it is certain he also often joins the lunatic with himself. That was done in the very case cited by Mr. Stock, as is seen in a report of it in an earlier stage.
 
 Lord Portsmouth's case,
 
 3 Aid. 63. It there appears to be l!a cause of nullity of marriage promoted and brought by John Charles, Earl of Portsmouth, acting by Mr. Fellows, his committee.” But, if it were otherwise in the Ecclesiastical Courts, it would yet be a proper mode of proceeding in a Court of Equity here; which may well follow either its own course or that of the ecclesiastical Courts in this respect,
 
 *102
 
 The usual course in a Court of Equity, after an inquisition an<^ aPP°intment of a committee, is by bill by the committee, joining the lunatic; and, although the object of the suit was (0 avoid the lunatic’s own act, it was held that the joinder was no cause of demurrer, even though then the maxim was, that no person could stultify himself; for the joinder .was considered.a mere formality.
 
 Ridler
 
 v
 
 Ridler,
 
 1 Eq Cas. Abr. 279;
 
 Brown
 
 v Clark, 3 Wood. Lec. 378, note, Stock on
 
 non
 
 compotes, 34. In this State we have said it was good either way.
 
 Shaw
 
 v
 
 Burney,
 
 1 Ired. Eq. 148. In
 
 Johnson
 
 v
 
 Kincade
 
 the bill was in the form of the present and we decreed on it. Indeed, we most approve of it, because upon suspending the commission,
 
 pendente lile,
 
 for the restoration of the party’s reason, the case would be proceeded in-without the necessity of a supplemental bill by the lunatic to procure the benefit of the proceedings as far as they had gone.
 

 The court, therefore, pronounces the marriage null; and, after what has been said, of course, with costs against the defendant.
 

 Decree (
 
 a
 
 ). Letitia M. A. Crump, acting by her committee William R. D. Lindsay, against 'Henry Morgan.
 

 March 2d, 1844. This cause coming on to be heard upon the bill, answer, exhibits and proofs, and being debated by counsel on each side, and the whole matter being considered by the court: It is thereupon declared by the court, that in the month of October, in the year 1839, in the county of Montgomery, the-ceremony of a marriage between the plaintifF Letitia M. A. Crump and the defendant Henry Morgan, was had and solemnized by and before a justice ot the peace for the said county: and that the said plaintiff had been, in July, 1838, duly found to be a lunatic and incapable of managing her affairs, and so to have been continually from April, in the year 1837, and had been duly committed as a lunatic, to the care and guardianship of her brother, the said William R. D. Lindsay as her committee: and also,
 
 *103
 
 that at the time of the fact of the said marriage thus had and performed, the said plaintiff Letitia M. A. was still der the care and custody of her said committee as a lunatic, and was, in fact, then and there a lunatic and person of tmsound mind and incapable from mental imbecility of understanding and consenting to any contract, and especially a contract of so high a nature as that of the said marriage : and that the said Henry well knew of such unsoundness of mind of the said plaintiff, arid by fraud and imposition without the knowledge of the said' committee or any friend of the said plaintiff, clandestinely, and for the'mere purpose of wicked gain, did procure the said marriage in fact to be had and celebrated : and the court doth further declare that the said plaintiff, hath, ever since the said marriage, in fact, continued to be, and is now, lunatic and' of unsound mind, and incapable of consenting to the said marriage, and thereby-confirming the same, evenrif such subsequent consent eould, in law, confirm and make valid the said marriage. Therefore, the court doth pronounce and declare the said pretended marriage
 
 tie facto,
 
 contracted ' and celebrated between the said Letitia M. A. Crump and Henry Morgan, to have been and to be utterly null and of no effect; and that the said Letitia was and is, and of right ought to be, free and at liberty from any bond of said pretended' marriage
 
 de facto
 
 ; and doth pronounce that she- ought to be divorced, and doth decree that she, the said Letitia M. A. Crump, be freed and divorced from the said Henry.
 

 And the court further decrees that the-said defendant pay all the costs of this suit, to be taxed by the proper officers.
 

 a
 

 Note. a.
 
 The reporter has inserted this decree at length, as such cases are novel in this State, and the form of the decree was settled by the court itself.