JESSIE ORR BUFFUM

*v.*

EDGAR BUFFUM, JR.

[Submitted February 1st, 1916. Decided February 17th, 1916.]

In a suit to annul a marriage under the Divorce act of 1907 (*P. L. 1907 p. 474* § 1 *subsection 4*), authorizing annulment when either of the parties was, at the time of marriage, incapable of consenting and the marriage has not subsequently been ratified, evidence that defendant was of unsound mind at the time of marriage *Held* sufficient to warrant the annulment.

Heard on petition, answer and proofs.

*Mr. George D. Mulligan,* of *Mulligan & Koenig,* for the petitioner.

*Mr. J. H. Thayer Martin,* solicitor assigned actively to defend.

FOSTER, V. C.

This petition by Jessie Orr Buffum to have her marriage to the defendant, Edgar Buffum, Jr., annulled on the ground of the defendant's incapacity to enter into the marriage contract, arising from his lunacy at the time of the marriage, is filed under the Divorce act of 1907, paragraph 1, subsection 4 (*P. L. 1907 p. 474*), which authorizes decrees of nullity of marriage when "the parties or either of them was, at the time of the marriage, incapable of consenting thereto and the marriage has not been subsequently ratified," and also under the supplement to the Crimes act, *2 Comp. Stat. p. 1778 § 105a* (*P. L. 1904 p. 270*), which forbids one who has been mentally deficient from marrying unless he procure the certificate of two physicians showing that he has been restored to mental vigor and that he will not transmit defects or disabilities to offspring.

The parties were married at the city hall in Newark, by Mayor Haussling, on June 7th, 1910, and after the marriage ceremony they returned to the home of defendant's parents in Newark, where they continued to reside until October 2d, 1910, when defendant was recommitted to the State Hospital for the Insane at Morris Plains, where he is now confined. An answer was filed and a defence made in defendant's behalf by a guardian *ad litem* appointed for that purpose.

The evidence discloses that in May, 1908, defendant having shown delusions was, on the advice of his physician, sent to Dr. Millspaugh's Sanitarium, in Paterson, for treatment. He remained in this sanitarium until March 16th, 1909, when his mental derangement having progressed to such a stage that adequate treatment could not be given him there, he was duly committed to the asylum at Morris Plains.

He remained at the asylum until October 2d, 1909, when he showed signs of improvement, and was removed by his sister, under an agreement with the hospital authorities that she was to be responsible for his custody and was to remove him from the state. He was taken to his uncle's home, on a farm, in East Weymouth, Massachusetts, accompanied by an attendant named Madden, who had been employed in the asylum.

At this time he was without property or income, except such as his family allowed him. He remained at his uncle's home until June, 1910, under the care of Mr. Madden, or his sister, or of some member of his uncle's family. He occupied himself by doing whatever interested him about his uncle's farm and was permitted to go about the town unattended, and made a number of acquaintances, among them being the petitioner. He first met the petitioner, who was then about twenty-two years old, in December, 1909.

After this defendant began paying attention to petitioner and at Christmas time he sent her a diamond pin worth about $100, which she returned to him. Notwithstanding this, he continued to meet her frequently and occasionally called on her. He was always very courteous, respectful and generous, and very free in spending what money he had. She did not take his attentions seriously and did not consider the possibility of marrying him, because he had no income and no means of supporting himself or a wife. On one of his visits he told her he had been very ill and had become tired out and gone away for a rest. No one ever told her he had been insane, or that he had been committed in an asylum. At this time he appeared in good health, was about twenty-eight years old, a tall, strong, athletic, powerful looking man, and acted at times like a spoiled child; he would became jealous, and when he could not have his own way, he would become very angry.

In April, 1910, he gave petitioner a box of candy. When she opened it she found a small velvet box in the centre of the candy, and this contained a diamond ring. She tried to return the ring to him but he refused to accept it, and told her if she sent it back he would throw it away. She believed he would do as he said, because on another occasion he wanted her to

break an engagement and go somewhere with him, and because she refused to do so, he threw away a ring his mother had given him. On other occasions she had seen him break up his hat or tear up a chain simply because he could not have his own way.

During his stay at the farm he made elaborate plans for turning the farm into a great institution and was going to raise crops that would bring him vast wealth. He wanted to raise turkeys, sheep and goats and do farming on an extensive scale, for which the place was not suitable and for which he had no money. He gave orders for expensive sheep and dogs which his family had to countermand.

On June 5th, 1910, he compelled petitioner to leave her home and go with him to Boston and Newark under the following circumstances: After church services that day he had lunch at her home and she told him she had a rehearsal engagement for the afternoon. After the rehearsal, she and her friend, Miss Bates, walked toward her home accompanied by defendant. In their walk they were obliged to pass the railroad station, which is located in an isolated part of the town. Defendant turned and said, "I am going to Newark and Jessie is going with me." She told him she could not go with him. Then he said, "We will go as far as Boston anyway and get something to eat." They could not get him to abandon the trip and then petitioner sent Miss Bates to notify defendant's sister where they had gone. Defendant had hold of petitioner at the time and as they were alone at the station, and she found she could not run away from him, and did not care to make a scene, she concluded to take the short trip to Boston, thinking she would be able to induce him to abandon the trip to Newark. On their arrival in Boston about five-thirty P. M. he made inquiries about a train for New York or Newark, and bought two tickets for the nine P. M. train.

They then went to the Adams House, where he registered as man and wife and engaged a room; then they had dinner, and when they came out of the dining room they met his sister and talked the situation over with her. Defendant said, "If you have anything to say, come upstairs and say it." When they reached the door of the room, defendant was very angry and pushed petitioner into the room and shut the door and locked

it. His sister tried to pull petitioner out of the room while he was pushing her in, and finding she could not do anything, she told petitioner to go in and she would get her out. Petitioner then begged and pleaded with him to let her out of the room, but he refused. Later his uncle, Mr. French, and Miss Bates came and talked to him through the transom and pleaded with him to open the door and allow the petitioner to leave the room. When told if he did not open the door they would bring the police, he became very angry and put a chair under the knob of the door. Then he took a wedding ring from his pocket and told the petitioner to put it on in case there was any trouble. She did not want to put it on, but as he became very angry she thought there was nothing else to do. Some one of the party outside came to the door at intervals, until twelve or one o'clock. When they ceased coming, defendant told her she better rest and directed her to take off her dress, which she refused to do, and then in her struggle with him, part of her garments were removed by him.

Later in the night, against her pleading and struggles, he had sexual intercourse with her. The next morning, before seven o'clock, they met Miss Bates and his uncle and sister in the hotel, and they tried to have him abandon his trip, which he refused to do. They then sought the assistance of policemen along the street to prevent him from taking petitioner to the railroad station, but without success. It was raining very hard at the time and neither of them had umbrellas or baggage. He provided no breakfast for her until after ten o'clock on the train. They reached Newark about five o'clock. On their arrival in Newark he took her to his parents' home and introduced her to his mother as his wife. Later in the evening, after his father came home, the parents talked matters over and they asked her if she had any certificate and defendant said, "Yes, they were up home, that he had been married before that." His father did not believe him and told him he must produce the certificate. The next morning defendant said to her, "I guess we better go downtown." He said he would have to get a license or certificate of some kind, because his father was objecting.

When they reached the city hall some paper was made out and the mayor came in and married them, and she was given the certificate. . They returned home and he showed the certificate to his parents. From the date of their marriage until his recommitment to the asylum on October 2d, 1910, they continued to live with his parents and he would not allow her to go out of the house alone, or to talk with his parents or sister unless he was present. During this period he did no work and had no income, and during his entire acquaintance with her he never gave her any money or clothing. He insisted on opening and reading any letters she received. She was not allowed to write any letters and he kept her continually under his observation and locked her in their room every night. He became very angry if she did not obey his orders about dressing and other personal matters, and if she attempted to leave the room he would prevent her doing so. In his fury over some trifling act of hers he took her diamond pin and broke it by stamping upon it. He also broke her comb and other things in their room and his demands upon her for sexual intercourse every day, and frequently oftener, were so excessive that her health became seriously impaired. In October, when he was being removed by the doctor and attendants for recommitment to the asylum, he told her he was all tired out and was going away for a rest. She had first learned of his insanity from his sister a short time before, in the month of September.

At no time did he ever mention marriage or speak about marriage to her. She married him, not knowing he had ever been insane, because she felt it was the only thing she could do after what had taken place between them at the Adams House.

Defendant was brought for treatment to Dr. W. H. Hicks of Newark by his sister in March, 1909, and he found him suffering from a form of insanity which he diagnosed as *dementia precox,* which, he states, is one of the most common forms of mental diseases, occurring usually in early life, in the teens or in the twenties. It is more or less progressive and is not curable. The symptoms are subject to remissions, during which the patient gets much better, but at no time are the symptoms

entirely absent. On his recommendation and certificate, and that of Dr. Morrison, defendant was originally committed to Morris Plains. In October, 1910, he was again called with Dr. Morrison to examine the defendant and found him in such a dangerous and excitable state that he advised that he be sent to the asylum without delay, as he did not think it safe to have him around the house. Defendant's sister had told him the history of the case, between the date of the first commitment and the date of his recommitment, and he and Dr. Morrison signed the papers to have defendant recommitted to the asylum. He does not think defendant will ever get well. His opinion is that the incidents sworn to by the petitioner and defendant's sister, if substantially true, taken in connection with his personal knowledge and observations of the defendant's condition, and also taken in connection with events subsequent to the marriage, show that on the day of the marriage defendant was insane and was in no mental condition to understand the gravity and consequences of the marriage contract; that he did not understand the duties and responsibilities that marriage created. From the two examinations he made of the defendant, nearly a year apart, the mental condition which he found absolutely convinced him that defendant was in no mental condition to judge rationally upon any subject, and from his knowledge thus acquired he "could not conceive of a time when the defendant would be normal and could grasp the relationship of ethical responsibility and social responsibility involved in the marriage contract," and that no remission of his disease would be strong enough to restore him to a normal understanding of the marriage contract. He has considered defendant incurably insane since he first examined him in March, 1909.

Dr. Evans, the medical director of the hospital at Morris Plains, states that when defendant was admitted to the hospital on March 14th, 1909, he was suffering from a serious form of mental disease known as *dementia precox,* which was characterized by delusions of persecution and suspicion, some mental confusion, abnormal excitability and a tendency to be violent, combative, abusive and profane. He was discharged on October

9th, 1909, because there was an abatement of his symptoms and he was improved and his relatives wanted to take him away. When he was recommitted in October, 1910, he was excited, confused, abusive and profane. He shortly got into difficulties with other patients and he became violent and destructive without any apparent cause. At the time of the hearing of this cause in May, 1915, his condition was much worse and he was then confined "in muffs" to prevent him from doing injury to persons and property, and the outlook is that he will never be cured.

Dr. Evans' opinion is that the incidents sworn to by the petitioner's witnesses, if substantially true, show that defendant on the day of his marriage did not possess that state of mind or reason which would enable him to understand the nature, force, character and responsibility of the marriage contract as a sane person does or should understand it; and that a person suffering from *dementia precox,* during a period of remission would be capable of misleading or deceiving a person not conversant with mental disorders, as to the real mental state existing. In his opinion, at the time of the marriage defendant was mentally unsound and did not have a proper comprehension of the responsibilities—legal, moral or social, which were entailed upon him and the woman he was about to marry, and that there is nothing in the case to indicate that circumstances subsequent to the marriage, or arising out of the marriage relation itself, brought about the recurrence of the disease.

. The present inquiry is confined to the question whether at the time of the marriage the defendant's mind was so impaired by disease that he was not capable of entering into the contract. *Kern* v. *Kern, 51 N. J. Eq. 574–586; Brainen* v. *Brainen, 79 N. J. Eq. 270–273.* The evidence produced by the petitioner in support of her allegations, consist of the testimony of persons as to defendant's conduct and of the medical testimony. This evidence shows an entire absence of intent on the defendant's part to marry petitioner. At no time, until the day of the marriage, did he mention the subject of marriage. He did not show her the consideration due to the woman about to become his

wife and possibly the mother of his children; he forcibly com-
pelled her to leave her home and family without notice to them,
and to travel with him to Boston and Newark without a change
of clothing, and without preparation for probably the most im-
portant act in her life; publicly he compelled her, in the presence
of his sister and uncle and her friend, to occupy a room with
him in the Adams House, and forcibly and against her will
compelled her to have intercourse with him. He manifested no
affection for her and showed no desire to shield or protect her,
but on the contrary, flagrantly exposed her to disgrace and
injury to her reputation; he made her wear a wedding ring
before they were married and registered her as his wife at the
hotel; he falsely introduced her to his parents as his wife, and
only married her when his father insisted upon seeing the mar-
riage certificate. When he went for the certificate he apparently
had no clearly defined idea what he had to do to obtain it. He
asked her to go down town with him without informing her of
the purpose of his trip. When they reached the city hall he
told her he would have to obtain a license or certificate to satisfy
his father, and they thereupon went through the marriage cere-
mony—he, in order to obtain the certificate, and she, because
she did not know what else to do after what had occurred between
them in the hotel in Boston.

His failure to ask petitioner if she would marry him; the
fact that he did not ask any member of his family to witness
the marriage ceremony; his inability to support himself or his
wife, or to provide a home for them; his purpose in going
through a marriage ceremony merely to obtain a certificate to
show his father; his failure to furnish his wife any money or
clothing during the four months they lived together after the
marriage; his insane and causeless jealousy of her; his purpose
in having her continually near him to satisfy his sexual de-
sires, and his constant watch upon her, locking her in her room,
reading her mail, refusing to permit her to converse with the
members of his family and becoming furiously angry over
trifling matters, all indicate a total absence of understanding of
the conditions of the marriage state and of its rights and
responsibilities.

While the question in the case is, as stated, a very narrow one, and is confined to the period when the marriage contract was entered into, it includes not only the question whether defendant at the time was aware that he was going through the ceremony of marriage, but also whether he was capable of understanding the nature of the contract he was entering. *Kern* v. *Kern, 51 N. J. Eq.* (at *p. 581*).

"Marriage is a legal bond around affections assumed to be already united and the blending in law of two lives into one. * * * Hence, in reason, the test question should be whether or not the parties have the capacity or mind required for duly comprehending this union. * * * The question in a marriage case is whether the alleged insane person acted rationally regarding the marriage and the particular one in dispute." *1 Bish. Mar. & D. 599–601.*

The circumstances previous to and in connection with the marriage ceremony, the subsequent conduct of defendant towards his wife and his treatment of her, taken in connection with the history of defendant's diseased mental condition and the positive testimony of the medical experts, show that he was not capable of understanding the nature of the contract he was entering into, and establishes the existence of defendant's mental disease at the time of the marriage ceremony, to the extent of incapacitating defendant from entering into the marriage contract.

Having reached the conclusion that defendant was of unsound mind at the time of the marriage ceremony, I have not considered it necessary to determine if the act of 1904, page 270, is applicable to the circumstances of the case.