WALTER A. WESTERMAYER, an Insane Person, by FRANCIS WESTERMAYER, His Guardian, Appellant, v. FLORENCE WESTERMAYER, Respondent.*

St. Louis Court of Appeals. Opinion Filed December 2, 1924.

1. **MARRIAGE: Civil Contract: Insane Persons: Marriage Not Within Purview of Statute Making Contract of Insane Person Void.** Marriage is a civil contract, but does not come within the purview of the statute making the contract of an insane person void, because it is a contract peculiarly individual and personal, and incapable of being made by a representative or guardian.

2. ———: ———: ———: **Condition of Mind at Time of Marriage Governs.** The condition of mind at the time of the marriage must govern the question of the capacity to enter into a marriage contract.

3. ———: ———: ———: **Weakness of Intellect: Not Sufficient to Invalidate Marriage if Party is Able to Comprehend Subject of Contract.** Mere weakness of intellect is not deemed sufficient to invalidate a marriage, if the party is capable of comprehending and understanding the subject of the contract, its nature, and probable consequence.

*(1) Marriage, 26 Cyc, p. 843; (2) Marriage, 26 Cyc, p. 844 (1926 Anno); (3) Marriage, 26 Cyc, p. 844;

4. ———: ———: ———: **Evidence: Insufficient to Show Mental Capacity to Contract Marriage.** Evidence reviewed and held not sufficient in weight and character to show that husband possessed mental capacities sufficient to understand the nature of the marriage contract into which he engaged.

5. ———: ———: ———: **Marriage Contracted While Under Temporary Insanity: Invalid.** The marriage of one subject to temporary or periodical insanity would be invalid if the marriage was contracted while under the influence of such insanity.

(4) Marriage, 26 Cyc, p. 913; (5) Marriage, 26 Cyc, p. 844 (1926 Anno).

Appeal from the Circuit Court of the City of St. Louis. —*Hon. Geo. H. Shields,* Judge.

REVERSED AND REMANDED (*with directions*).

*Marion C. Early* and *Ivon Lodge* for appellant.

(1) This is an equity case and this court will review the law and all the evidence. If it finds that the judgment of the trial court is not supported by the law and evidence or that upon the whole record the judgment is against public policy it will reverse the case and remand with directions. Gross v. Gross, 96 Mo. App. 486; Slais v. Slais, 9 Mo. App. 96; Chapline v. Stone, 77 Mo. App. 523. (2) Marriage is considered in law as a civil contract and in order to make a binding marriage contract both of the parties must be capable of contracting. Chapline v. Stone, 77 Mo. App. 523; Turner v. Myers, 1 Hagg. Con. R. 416; Wagmire v. Jetmore, 22 Ohio St. 273; Rawdon v. Rawdon, 28 Ala 565; True v. Ranney, 21 N. H., 83; Clark v. Clark, 10 N. H. 382. (3) A broad degree of general insanity will of itself without special inquiry into the individual transaction invalidate the marriage. 1 Bishop on Marriage and Divorce, par. 600; 18 Ruling Case Law, 405; Durham v. Durham, 10 P. D. 80. (4) The finding and judgment in this case is

against not only the weight of the evidence, but is contrary to all the probative evidence in the case. (5) The trial court is not supported by the evidence of a single witness in finding Walter had a lucid interval in October, 1919, for all of defendant's witnesses testified not only that he was sane in October, but that he was just as sane while in the sanitarium. (6) There was no issue of fact as to whether or not Walter was insane at the time of the trial, for defendant's counsel admitted that in his memorandum. (7) To uphold such a pretended marriage is against public policy and a menace to society. (8) Public opinion disapproves of the court's stamping as valid a marriage of this sort as evidenced by the repeal and re-enactment of sec. 7299, R. S. 1919, page 469, Law of Missouri, 1921.

*Edward W. Foristel* and *O. J. Mudd* for respondent.

(1) The order overruling the motion to set aside the previous order overruling the motion to set aside the decree and for a new trial is not appealable. Bonfils v. Food Service Co., 253 S. W. 982. (2) As there is a "strong contradiction" in the evidence, the finding of the Chancellor, although not conclusive, is entitled to weight, and we submit should prevail. Price v. Ransche, 186 S. W. 958; Sinnett v. Sinnett, 201 S. W. 887. (3) To annul a marriage on the ground of mental incompetency the sufficient insanity must be made to appear not merely by a doubtful preponderance, but must be made to appear so as to be very clear. 9 R. C. L. 292, infra; Cole v. Cole, 5 Sneed 57, 70 Am. Dec. 275; Durham v. Durham, 10 P. D. 80. The decree dismissing plaintiff's bill is sustained by the law. 26 Cyc. 908 (infra); Id. 902 (infra); 9 R. C. L. 288 (infra); Slais v. Slais, 9 Mo. App. 96; Henderson v. Henderson, 141 Mo. App. 540; 38 L. R. A. (N. S.) 818, note.

NIPPER, C—This is a bill in equity brought by the plaintiff, through his father acting as his guardian, to

annul a marriage between Walter A. Westermayer and defendant. Walter A. Westermayer enlisted in the army on June 4, 1918, at St. Louis, Missouri. In November, 1918, he was honorably discharged from the Army of the United States, and brought to the City Hospital in St. Louis, the reason for the discharge being that he had become insane, and was suffering from that form of insanity denominated as *dementia praecox,* catatonic form. He was afterwards transferred to the City Sanitarium of the city of St. Louis, such institution being one for the care of insane persons. On March 31, 1919, he was adjudged insane by the probate court, and his father, John B. Westermayer, was appointed as his guardian. After this case was argued and submitted, John B. Westermayer died, and Francis Westermayer was substituted as guardian. When he first came to the city sanitarium or insane hospital he was what was termed a "stretcher patient," being unable to walk or talk, and was practically helpless. He was kept at this institution until August, 1919, at which time he had improved both mentally and physically, to the extent that he could walk where he desired without any assistance or difficulty, and had improved mentally to the extent that his father and mother felt that they could, perhaps, take care of him in their own home, and insisted on taking him away from the sanitarium and removing him to their home, so that he could be quiet, and have the personal care and attention of a father and mother. The physicians in charge of the sanitarium objected to this action on the part of the parents, on the theory that he was not in a condition to be taken away from the sanitarium, but the wishes of the father and mother prevailed and he was taken home for the purpose of ascertaining whether or not he would improve at home as well as at the institution, and in order that his father and mother might give him their personal care and attention. He was twenty-two years of age at the time of his enlistment in the army, and just before he departed it appears that he had some idea of marrying the defend-

ant. His parents, or his mother at least, objected, advising him that it would be a mistake for him to marry just before entering the army, because it was possible that he might become maimed, wounded, or crippled for life, and in view of this possibility it would be best if he would wait until his return from the army. There is some evidence from witnesses of defendant that the mother objected further on the ground that if her son was killed the defendant would get the insurance, and also his property amounting to some few thousand dollars, which had been given him by his father.

The testimony of Dr. George A. Johns, who was Superintendent of the City Sanitarium, and had been connected with the institution for more than fifteen years, as well as the testimony of Dr. Lewald, who had been connected with the institution for several years, and the testimony of the nurses in attendance upon the plaintiff, and also the testimony of his father and mother, shows beyond any question of doubt that he was insane at the time he entered the sanitarium, and was insane at the time he left. In fact this much of the statement of facts in this case must necessarily be conceded by any reasonable mind who reads this record.

Prior to the time he left the sanitarium in August, the defendant, as well as other friends and relatives, were permitted to visit him on different occasions, and during the latter portion of his stay, prior to his being taken home in August, he would occasionally be taken on automobile rides, and kept away from the institution for an hour or two at a time. He was kept at home by his parents, and permitted to go out during the day, for about two months. During this time he was not seen or visited by the doctors or nurses who had charge of him at the sanitarium, but the father and mother both testified that they noticed no difference in his condition during his stay at home. During the period from the time he was brought home in August, 1919, until the date of his marriage to defendant about October 7, 1919, he was extremely nervous, told his father and mother that they

were crazy, would lie down on the floor, make peculiar and unusual statements to the effect that he could take his head off his body and put it back again, and would take the Bible and lay it on the table, read it all day and refuse to eat, saying: "I only eat the eats from God." He would tell his mother that he could make his arms jump from his body like a jumping-jack, and that they would fly back again; that he would write on tablets for hours at a time and say he was writing poetry. He wanted to go to the bank and borrow $100 to improve certain streets in the city of St. Louis, and devoted a great deal of time to talking about helping the poor, when the record discloses he had no means except what little his father had given him; and on one occasion wanted to jump out of the upstairs window.

During his stay at home, and prior to the date of the marriage, the defendant would visit him, and he would visit defendant at her home. About the 7th of October, he left home in the morning and told his parents he was going over to defendant's home, and that he and defendant were going to witness the Veiled Prophet's Parade. He was told that this could not be seen until night, but he replied that he and defendant were going down town. On that occasion he went with defendant to Alton, Illinois, and was married by a justice of the peace, and he returned to his home about 10:30 that night. On October 11th they were married at Our Lady of Sorrows Church by Father Stolte, who testified that he did not notice anything wrong with defendant at the time he performed the marriage ceremony; that he saw him on two different occasions, about fifteen minutes each time, and noticed nothing unusual on either occasion.

Joseph Dougherty, a friend of both plaintiff and defendant, was working at the Grand Leader on October 10th, the day before the church ceremony was performed, and plaintiff, Walter Westermayer, came to the place where Dougherty was working, accompanied by defend-

ant's mother, and requested him to act as groomsman at the church wedding to be performed the next evening. He consented and agreed to act, and stated that he did not notice anything unusual in plaintiff's conduct, and also stated that plaintiff did not act any differently than he had on prior occasions during the past four years he had known him.

Defendant testified that there was nothing strange or unusual about plaintiff's conduct at any time on October 7th or October 11th, when the marriage ceremonies were performed, either at Alton, or at the church, and she testified to numerous acts and conduct on the part of plaintiff which would indicate that he was perfectly sane on those occasions. She said that he spent a week at her home immediately after his return from the city sanitarium, with his parents' consent, and that she did not observe anything unusual about his conduct; but she also testified that she had never at any time detected any hallucinations or other indications of insanity displayed by plaintiff, and had never known anything that would indicate that plaintiff was of unsound mind, but that she considered him a little above the average in intelligence.

The father of plaintiff testified that he had made up his mind the day prior to the time he learned of the marriage, that he would have to take the plaintiff back to the sanitarium, because he was getting no better at home. A few days after the marriage he did take him back, and he has been confined in that institution since. At the time of the trial he was there. He was brought into the court room but did not testify, and was not called by either party. The physicians and nurses in charge of the sanitarium testified that he had been insane continuously before and since his return to the institution, and at no time, in their opinion, did he possess sufficient mental capacity and understanding to contemplate or appreciate anything of the solemnity of a marriage or a marriage contract.

There were many witnesses who testified for defendant to the effect that they had seen plaintiff while he was at home, and about the time of the marriage, and that they saw nothing strange or unusual in any way about his conduct. However, many of these witnesses were relatives of the defendant, or those who had some personal feeling against plaintiff's father and mother. This is not true of all the witnesses who testified for defendant, but it is true of most of them. One, Dr. Wolfort, testified on behalf of defendant that, after the marriage, and between the time that plaintiff re-entered the sanitarium and the date of the trial, he had examined plaintiff on two occasions. These examinations were merely the results of two visits he made to the sanitarium. He talked to plaintiff about twenty-five minutes on one occasion, and about forty-five minutes on another. He testified that at the time he talked with plaintiff he was, in his opinion, thoroughly capable of understanding the nature of the marriage contract, and had no business in any insane asylum. This doctor did testify, however, that most of us have spells when we are not lucid, and placed himself in that class.

It appears from the testimony of the nurses and attendants who waited upon this plaintiff after his return to the sanitarium, as well as the doctors in charge, that he at no time since he was returned to that institution has experienced any lucid intervals so that he might understand the meaning of such a contract as marriage, or what it meant. One doctor testified that he would probably have sufficient mentality to know that the defendant was his wife, but that was all. On one of the days during the trial, one witness testified she had talked to plaintiff in the court room; that he asked her about her boys, and, because he called her boys by name, she decided that he was perfectly sane; while it appears from the evidence of the nurses who stayed with him in the court room that on the same day he told them that

his case should have been brought in the Supreme Court, but that he was supreme, and that he should not have left the court room without his being given a check for $10,000.

During the time he was at the institution, after his marriage, and prior to the trial of this case, he was continuously writing letters to the President, the Governor of the State, and the Mayor of the city, and various other persons. Many of these letters were introduced in evidence, and show clearly that they were written by a person of unquestionably unsound mind. A fair sample of these letters is one written to the mayor, in which he advised the mayor that he had seen him in church on a previous Sunday, but didn't know what he was doing there; that it would be all right to leave his wife, because "I got hands that won't behave." Then he suggested in this letter that they talk about the Bond Issue, and advised the mayor to endorse the municipal bonds, because he (plaintiff) had to confiscate half of the "dough" and use it to build homes for the poor. He then advised the mayor in this letter to put the money in the Tower Grove Bank so that it would be handy, because "I am the most handiest man in creation." Most of the witnesses who testified on behalf of defendant and stated that the plaintiff's condition was such that he thoroughly understood the nature of a marriage contract, also stated that during the time these very things were happening which have just been detailed, in their opinion plaintiff was sane.

The learned trial judge handed down a written opinion in this case in which he held that the testimony showed indisputably that during plaintiff's stay in the asylum he was manifestly insane, but held that the preponderance of the evidence was in favor of the defendant on the question of whether, at the time of the marriage plaintiff understood what he was doing, and the nature and relation of the marriage contract. Judgment was rendered for the defendant, and the plaintiff's petition dismissed. The court evidently proceeded upon the

theory that the plaintiff had a lucid interval at the time of his marriage, in which he understood thoroughly what he was doing.

It was held in Payne v. Burdett, 84 Mo. App. 332, that marriage is a civil contract, but does not come within the purview of the statute making the contract of an insane person void, because it is a contract peculiarly individual and personal, and incapable of being made by a representative or guardian. And, in Henderson v. Henderson, 141 Mo. App. 540, 126 S. W. 203, it was held that the condition of mind at the time of the marriage must govern the question of the capacity to enter into a marriage contract.

In 9th R. C. L. 288, it is stated that mere weakness of intellect is not deemed sufficient to invalidate the marriage if the party is capable of comprehending and understanding the subject of the contract, its nature, and probable consequence.

It is apparent from an examination of the authorities that it would be dangerous as well as difficult to prescribe the exact degree of mental capacity necessary to the validity of such a contract. Such contracts, in many cases, depend upon sentiments of attachment and affection, which the weak as well as the strong intellectually may feel. Thus, a marriage contract differs in many respects from all other civil contracts.

Learned counsel for respondent, in seeking to uphold the judgment of the chancellor, cites several authorities, but only two Missouri cases. The first is Slais v. Slais, 9 Mo. App. 96, the other, Henderson v. Henderson, supra.

After a careful examination of this record, as well as a thoughtful consideration of the testimony disclosed by the various witnesses, we are unable to agree to the conclusions reached by the chancellor in this case.

In the case of Henderson v. Henderson, supra, the court refused to annul the marriage on the ground of mental incapacity of the husband, who, according to the evidence offered by the parties seeking to annul the mar-

riage, was a man unable to act for himself, with physical and mental faculties greatly impaired. He was, according to some of the evidence, deaf, cross-eyed, and unable to speak intelligently, or articulate perfectly. But, it appears that he went about over the country where he pleased, accompanied only by a nurse, who watched over him, cared for him, and eventually married him. The overwhelming weight of the evidence in that case showed that the husband did possess sufficient mental capacity to understand and comprehend the nature of the marriage contract. The court said that, if the testimony of intelligent and reputable witnesses was to be believed, the conclusion was irresistible in that case that deceased was in a sane condition of mind at the time of the marriage. The court further based its finding upon the additional ground that the suit was not brought until after the death of the alleged insane person, and the case was at best but a struggle for property.

In Slais v. Slais, supra, the husband had been first divorced from his wife, after which he remarried her, and then sought to annul the marriage on account of the insanity of the wife. The court said that the insanity of the wife seemed to have been an afterthought, and refused to annul the marriage.

In Chapline v. Stone, 77 Mo. 523, this court reversed the judgment of the circuit court, and directed a decree annulling a marriage, where the husband brought suit against the wife, on the ground that she was insane at the time of the marriage, and had been continuously insane since. In that case the wife appears to have been of unsound mind all her life, but the husband did not know it at the time he married her, although he had known her for several years.

In the case before us we have the testimony of reliable and reputable physicians, who have spent most of their professional career studying and dealing with insane persons, as well as the testimony of nurses who were in constant attendance upon the plaintiff during his stay in this sanitarium, both before and after his

marriage. All their testimony is to the effect that he was insane when he left the sanitarium, insane when he returned, and at no time during his stay in the sanitarium has he had a lucid interval in which he would understand the meaning of the marriage contract. These witnesses certainly could have no interest in the result of this case. The father and mother, who had their son at home under their watchful care, both testified that there was no change in his condition at any time while he was at home. He was not what would perhaps be termed a "raving maniac," but he was insane, and suffering from a form of insanity which, according to the testimony of these physicians just referred to, is serious in its nature and character. It is true there are a number of laymen who testified for defendant to the effect that plaintiff was sane at the time of the marriage, but they, or many of them, testified that he was sane at all times. Therefore, this testimony must be received for what it is worth, and it is not sufficient in weight and character to convince us that plaintiff understood the nature of the contract into which he engaged. His father and mother certainly would not want to incarcerate him in an institution of this kind without being conscientious in their belief as to his insanity. This belief is supported by the testimony of all the medical experts except the one for defendant above referred to, Dr. Wolfort, who was with defendant only on two occasions, and who based his testimony as to his mental condition upon the two conversations he had with him. It would be opposed to common sense, natural justice, and public policy, to permit this marriage contract to stand, in the face of the facts revealed by this record.

The marriage of one subject to temporary or periodical insanity would be invalid if the marriage was contracted while under the influence of such insanity. The condition of mind at the time of the marriage, however, must govern the question of mental capacity to enter into a marriage contract. The defendant in this case is and was suffering from a form of insanity of such a kind

and character as eminent specialists pronounced incurable. This is not a case where one of the parties to the marriage contract has always been of weak mind such as may be commonly called an imbecile or weak-minded person, but was a young man of average intelligence who became insane prior to the marriage. The learned chancellor so found; and there seems to be no question raised but that he was insane prior to the marriage, and insane immediately afterwards. And all the substantial testimony points to the fact that he was insane at the time the marriage contract was entered into. Under such circumstances the marriage contract should be declared invalid. [Buffum v. Buffum, 86 N. J. Eq. 119; Johnson v. Kincade, 37 N. C. 470; Crump v. Morgan, 38 N. C. 91; Goodheart v. Ransley, 28 Ohio L. J. 227; Jacques v. Public Administrator, 1 Bradf. (N. J.) 499.]

Therefore, the Commissioner recommends that the judgment be reversed, and the cause remanded, with directions to enter a decree setting aside and annulling the marriage between plaintiff, Walter A. Westermayer, and the defendant.

PER CURIAM:—The foregoing opinion of NIPPER, C., is adopted as the opinion of the court. The judgment of the circuit court is accordingly reversed, and the cause remanded, with directions to enter a decree in accordance with the recommendations of the Commissioner.

*Allen, P. J., Becker* and *Daues, JJ.,* concur.