Mary E. SHEFFIELD et al., Appellants,

v.

Odessa Kay Kelly ANDREWS, Respondent.

No. 25162.

Kansas City Court of Appeals.

Missouri.

April 7, 1969.

John R. Cleary, Kansas City, Linde, Thomson, VanDyke, Fairchild & Langworthy, Kansas City, of counsel, for appellants.

Donald E. Raymond and Robert E. Gregg, Kansas City, for respondent.

MAUGHMER, Commissioner.

This is a proceeding to declare void the marriage of the defendant, Odessa Kay Kelly Andrews, to one Clarence C. Andrews, on the ground that he was "senile and feeble-minded" at the time the marriage was consummated. The ceremony was performed on October 23, 1965. Mr. Andrews died intestate on December 20, 1966. He left surviving him no child or children or descendants of any child or children. His legal heirs were the defendant as his surviving spouse, three half-sisters and eleven nephews and nieces of the half-blood. His estate consisted of both personal property and real estate, estimated to have a value of at least $50,000.00. This appeal was first lodged in the Supreme Court. That Court held that jurisdiction was in the Kansas City Court of Appeals since the transcript does not show affirmatively and with certainty that the net value of the estate exceeds $15,000.00. If the marriage is annulled these relatives of the half-blood will inherit the whole estate. If the suit fails then defendant, as the surviving spouse, will share in the inheritance.

The suit was commenced on January 20, 1967, some fifteen months after the marriage and one month after the death of Mr. Andrews. The original petition was filed by Mary E. Sheffield, a half-sister. On April 14, 1967, the petition was amended by joining Nellie Glade and Esther M. Andrews, also half-sisters and the eleven surviving nephews and nieces of the half-blood, as parties plaintiff. The petition specifically invokes and declares under Section 451.020 V.A.M.S., which provides in part: "All marriages * * * between persons either of whom is insane, mentally imbecile or feeble-minded, are prohibited and declared absolutely void; * * *".

After a trial during which evidence from both sides was heard, the Court found against plaintiffs, refused to declare the marriage to be void and ruled that a valid and legal relationship of husband and wife existed between Mr. Andrews and the defendant. The Court found that at the time of the marriage Mr. Andrews "understood the marriage relationship and the effect and consequences thereof", and that plaintiffs had failed to show by a

preponderance of the evidence that Mr. Andrews lacked the mental capacity to understand the marriage contract.

Plaintiffs have appealed. On appeal three assignments of error are designated. The first asserts that since the Court overruled the motion for judgment at the close of plaintiffs' evidence it was error to sustain such a motion after all the evidence was in, since defendant may not recover upon her own evidence. This point is without merit for at least two reasons. One, the Court, only tentatively overruled at the close of plaintiffs' case and stated it was denied *"at this time"*; second, the Court considered all of the evidence and made specific Findings of Fact and Conclusions of Law upon which the judgment was predicated. The other two assignments are to the effect that the Findings of Fact and Conclusions of Law and the judgment itself are for the wrong party.

This is a court-tried equity case. On appeal we review upon both the law and the evidence and we shall not set aside the judgment of the trial court unless it be clearly erroneous. We are further admonished to give due regard to the opportunity of the trial court to judge of the credibility of the witnesses. Section 510.310 (4) V.A.M.S. and Rule 73.01(d) V.A.M.R. Sanderson v. Richardson (Mo.App.) 432 S.W.2d 625.

Clarence C. Andrews was born in 1875 and was therefore 90 years of age when he intermarried with the defendant, who had been his housekeeper since 1962. About September 14, 1965, Mr. Andrews fell and suffered a broken hip. He was hospitalized with the broken hip from September 14, 1965 until October 9, 1965. Mr. Andrews was cared for during a part of his hospital stay and afterwards for a few weeks in his home by Mrs. Anne Terry, a registered nurse. On October 22, 1965, the Public Administrator of Jackson County, Missouri, filed a petition in the Probate Court of Jackson County, Missouri, asking that Mr. Andrews be adjudicated an incompe-

tent and a guardian be appointed. The next day (October 23, 1965) the marriage ceremony was performed in Mr. Andrews' home. On November 9, 1965, after a hearing in the Probate Court, Mr. Andrews was ruled to be an incompetent person. The Court appointed the defendant guardian of his person and the Public Administrator guardian of his estate. A short time thereafter the Public Administrator brought a proceeding seeking to remove the defendant as guardian of Mr. Andrews' person. This proceeding failed and Mrs. Andrews continued to be guardian of the person until Mr. Andrews' death.

The plaintiffs called two lay witnesses to give testimony as to Mr. Andrews' physical and mental condition at or near the time of the marriage. Mr. Sam Schultz, President of the Merchants Produce Bank of Kansas City, Missouri, had known Mr. Andrews for about 15 years. He saw him at the hospital around October 1, 1965, knew he was there with a broken hip, said Mr. Andrews did not recognize him and "stared off into space". Mr. Schultz saw Mr. Andrews one more time at the hospital and twice thereafter at the home. He said that on neither of these occasions was Mr. Andrews able to carry on a conversation, that he did not know Mr. Schultz or remember the bank. He described his condition as "bedridden and incoherent".

Mary Parsons testified that she had known Mr. Andrews since about 1946. A relative of her husband had, at one time, lived in Mr. Andrews' home. She visited deceased several times during his hospitalization in 1965. She said he was on these occasions confused and irrational, thought he was in St. Joseph, Missouri, rather than in St. Joseph Hospital in Kansas City, and that he couldn't remember or make himself understood. She stated that the defendant in June, 1965, had told her about Mr. Andrews' mental deterioration and stated that she believed she could "convince Mr. Andrews to marry her". Mary Parsons, shortly after the marriage, located and telephoned Mrs. Mary E. Sheffield, the orig-

inal plaintiff in this suit, at her home in Wichita, Kansas, and advised her of the marriage, the guardianship proceedings and conditions generally. Mrs. Sheffield and the other half-blood relatives had "drifted apart" from Mr. Andrews after the death of their father which occurred some 25 years earlier, and they knew nothing about his status in 1965—where he lived, that he was ill or that he had married.

Dr. Martin Hunter, M. D., testified by deposition. He had been Mr. Andrews' physician for some twelve years and attended him during the 1965 hospitalization. From the nervous and mental standpoint, his diagnosis was that the patient was suffering from a "chronic brain syndrome". He said he made this diagnosis first in 1964 and that the condition got progressively worse. The doctor defined "chronic brain syndrome" as "gradual central nervous system degeneration"; "usually secondary to arteriosclerosis or hardening of the blood vessels where their mental acuity lessens and the judgment lessens and his ability to get around physically and mentally is less"; "it is a senile type of mental dampening". He said the patient at the hospital suffered from lack of memory, was not sure where he was, became physically lost, was in a confused mental state, and on October 9, 1965 was not able to handle "his own behavior and environment". Dr. Hunter testified to these conditions at the Probate Court hearing. He also advised Mr. Andrews to enter a nursing home but the patient was very much opposed to this idea. Dr. Morton Jacobs, a psychiatrist, examined Mr. Andrews on November 1, 1965, and expressed his opinion that he did not have sufficient capacity to handle his ordinary affairs.

On October 18, 1965 the defendant and a Mrs. Ethel Brown (who was deceased at the time of the trial) took Mr. Andrews to Miami, Oklahoma in an automobile. The purpose of the trip was for defendant and Mr. Andrews to get married in Oklahoma. The plan failed. The following persons were present in Mr. Andrews' home in Kansas City, Missouri on October 23, 1965 and witnessed the marriage ceremony:

Reverend Daniel Carpenter, officiating minister,

Mr. and Mrs. Charles Cooper, defendant's sister and brother-in-law,

Mr. and Mrs. Vance Jackson, defendant's brother and sister-in-law,

Mrs. Anne Terry, registered nurse, who had cared for Mr. Andrews in the hospital and in his home during the fall of 1965.

Mrs. Betty Cooper, sister of the defendant, said she had known Mr. Andrews for about six years. She saw and visited with him when he came home from the hospital in 1965—one occasion being four days before the marriage. She said that on all of these occasions he recognized her, carried on a normal conversation and did not seem to be confused; that he discussed the proposed marriage with her, told her what property he had, and said that he and his prospective bride respected each other. She testified that he made normal responses at the proper times during the marriage ceremony. Mr. Charles Cooper, brother-in-law of defendant, said that on these occasions Mr. Andrews "knew what he was talking about".

Mrs. Anne Terry, the registered nurse who had attended Mr. Andrews during the 1965 hospitalization and in his home afterwards, also testified. She said that when the patient was receiving medication at the hospital and at home he at times seemed confused, but when he was taken off the medication "his mental condition sharpened immensely". She described his condition at and during the marriage ceremony as "quite alert; he knew what he was doing".

Mr. Robert M. Fox, an attorney, saw Mr. Andrews in August, 1965 and again on October 23, 1965. It was this witness's expressed opinion, which was received without objection, that deceased understood the nature, effect and consequences of the marriage.

Reverend Daniel L. Carpenter, Baptist minister who performed the marriage, said he talked with Mr. Andrews before the ceremony, that the "responses were pertinent"; "that he understood he was being married"; and "there was nothing whatsoever about his conduct or the conversation or his responses * * * that indicated that there was any impairment of his mentality."

■ Every person is presumed to be sane until the contrary is shown. Forbis v. Forbis (Mo.App.) 274 S.W.2d 800, 806. In Carr v. Carr, 232 S.W.2d 488, 489, the Supreme Court said: "The presumption of the validity of the last marriage may be repelled only by the most cogent and satisfactory evidence." In Henderson v. Ressor, 265 Mo. 718, 178 S.W. 175, 179, the Supreme Court en banc used and approved the following declaration:

"* * * In order to authorize a decree, at this late day, after the death of one of the parties, annulling the marriage on the ground of want of capacity of the deceased, such want of capacity should be shown by evidence clear and cogent, as a court of equity in such a case will not weigh the pros and cons in order to determine to a nicety which way the scales preponderate. * * *"

Certainly there are vast differences between the marriages of youth and the marriages of age. Youth is the period of fruition. The parties pool their talents, their hopes and their productive days in order to carve a career, rear a family, gain economic security and develop an affection for each other based upon a lifetime of association and growth together. Marriages entered upon during the twilight years are after the season is done. The seed has been sown, the crop has been tended and the harvest has been reaped. The surviving partner then needs mostly care and companionship. Shall he be denied this solace because his faculties have deteriorated as they must with age? Shall his decision to embrace such a second association be called foolish or shall it be considered to be a reasonably wise choice and judgment?

The fact that Mr. Andrews had no closer relatives than sisters of the half-blood and that they had "drifted apart" with no communion for a score of years, makes no difference in this case except that it does demonstrate that deceased had no relative upon whom he might rely or depend for either care or companionship. He knew the defendant. In 1965 when they were married she had attended him for some three years. He was appreciative of and satisfied with that care. His expressed preference to have that care and companionship continued rather than for it to be supplanted by that of a nursing home is understandable. Such a choice is certainly not on its face the choice of an insane person or an imbecile.

■ At most, plaintiffs' evidence shows that Mr. Andrews was of advanced years; he had just been hospitalized with a broken hip; those twins age and arteriosclerosis were with him; physically and mentally he had deteriorated. Plaintiffs produced some witnesses who described Mr. Andrews' behavior as consistent with rather complete mental instability. The Probate Court, after hearing testimony, placed him under guardianship. However, defendant's evidence conflicted sharply as to the main issue, namely, the deceased's ability to understand that he was being married and the consequences thereof. Numerous witnesses described his condition, behavior, speech and understanding as normal or nearly so. It is possible for an individual to be able to understand that he is being married and to be knowledgeable as to the effects and consequences of such a relationship, and still not be able to wisely manage his property and business affairs. This man lived for 14 months after the marriage and was able to stay out of nursing homes, places he earnestly wished to avoid. These witnesses

who testified that he understood that he was being married and understood the consequences of such a relationship included neighbors, some relatives, a registered nurse who had cared for him, and the officiating minister. These constituted a rather impressive array of witnesses.

Plaintiffs have invited our attention to decisions from the Courts of Virginia, Mississippi, California, Alabama and Florida. In each of the opinions from these foreign jurisdictions, the decision of the trial court nullified the marriage and such action was affirmed on appeal. In the case before us the opposite is true. Here the trial court accepted the version of the defendant's witnesses and ruled that plaintiffs had not sustained their burden of proof. On appeal we are directed "to give due regard" to the opportunity of the trial court to judge the credibility of the witnesses.

In Westermayer v. Westermayer, 216 Mo. App. 74, 267 S.W. 24, 26, which was a suit to set aside a marriage contract on the ground that one of the parties thereto was insane, the Court made the following statement as to the main issue and as to the degree of mental incapacity which must be found in order to justify voiding the marriage:

"It was held in Payne v. Burdette, 84 Mo.App. 332, that marriage is a civil contract, but does not come within the purview of the statute making the contract of an insane person void, because it is a contract peculiarly individual and personal, and incapable of being made by a representative or guardian. And, in Henderson v. Henderson, 141 Mo.App. 540, 126 S.W. 203, it was held that the condition of mind at the time of the marriage must govern the question of the capacity to enter into a marriage contract. In 9 R.C.L. 288, it is stated that mere weakness of intellect is not deemed sufficient to invalidate the marriage, if the party is capable of comprehending

and understanding the subject of the contract, its nature, and probable consequence. * * *"

In the Westermayer case the mental capacity of young Mr. Westermayer, a resident of St. Louis, Missouri, was in question. He was 24 years of age and had enlisted in the United States Army. Within a few months he was discharged with a medical diagnosis of "Dementia Praecox, Catatonic type"—a positive finding of insanity. He was immediately placed in a mental institution for care and treatment. After several weeks there was no improvement, but his parents, against medical advice, took him home. It was necessary for someone to be with him at all times. He had delusions and regularly wrote letters to the Mayor of St. Louis and to the Governor. He imagined he had great wealth and planned to rebuild a part of the City of St. Louis and eliminate poverty in the area. One afternoon he and a neighbor girl whom he had known, left home ostensibly to view the Veiled Prophet parade which was to be held that evening. However, instead of watching the parade they crossed over into Illinois and were married. Within a few days the young man was again placed in a mental institution. There were expressions from interested persons that he was lucid at the time of the marriage ceremony. The trial court found him to be insane immediately before and immediately after the marriage but knowledgeable at the time the ceremony was performed. The Appellate Court reversed. In our opinion Westermayer is easily and readily distinguishable on the facts from our case.

We are impressed by the evidence adduced by the defendant. If we yield to the trial court on the question of credibility, as we are required to do, the defense must prevail. Certainly we cannot say the judgment of the trial court is clearly erroneous.

Therefore, the judgment is affirmed.

SPERRY, C., concurs.

PER CURIAM.

The foregoing opinion by MAUGHMER, C., is adopted as the opinion of the Court.

HOWARD, P. J., CROSS, J., and HARRY A. HALL, Special Judge, concur.

SHANGLER, J., not participating because not a member of the Court when case was submitted.