MAHURIN v. MAHURIN.   (No. 8099.)

(Court of Civil Appeals of Texas.   Dallas. Jan. 25, 1919.)

1. DIVORCE ⚖149—CONDONATION—PRESUMPTION FROM LIVING TOGETHER—REBUTTAL BY FINDING.

In wife's suit for divorce, any inference, from parties' living together after husband's cruel treatment, that they cohabited during such time *held* rebutted by finding in response to special issue that they did not cohabit.

2. DIVORCE ⚖49(1) — CRUELTY — CONDONATION.

Where wife lived with husband after his last assault upon and cruel treatment of her only under some kind of hallucination or abnormal condition that rendered her irresponsible for her own conduct, she could not condone his treatment, and is entitled to divorce therefor.

Appeal from District Court, Hill County; Horton B. Porter, Judge.

Suit for divorce by Dessie Mahurin against Otho Mahurin. From judgment for plaintiff, defendant appeals. Affirmed.

Shurtleff & Cummings, of Waco, for appellant.

Dupree & Crenshaw, of Hillsboro, for appellee.

RAINEY, C. J. Appellee brought suit for divorce against appellant, to whom she was married on the 15th day of November, 1914, and lived with him until the 7th day of August, 1917, when by reason of cruel treatment by appellant she was caused to abandon him, and prays that she be awarded the custody of their child, Juanita.

Appellant answered by general exception, general denial, and specially pleaded condonation on the part of appellee by living with him after commitment of said cruel treatment, and prayed that he be awarded the custody of the child, and, in the event this is not granted, that he be permitted at all reasonable times to visit said child.

The court submitted the case to the jury on special issues, which being answered by the jury favorable to appellee, the court rendered judgment thereon in her favor, from which this appeal is taken.

There is only one assignment of error presented by appellant, which is as follows:

"The court erred in refusing to set aside the verdict of the jury and the judgment of the court rendered thereon, because the undisputed testimony in this case shows that the plaintiff, Dessie Mahurin, condoned whatever conduct she charges that the defendant engaged in, and which is alleged by her as grounds for a divorce, the plaintiff's undisputed testimony being that, after all the acts and conduct testified by her to have occurred had transpired, she continued to live with him as his wife, and continued to love him, and that several nights intervened after the last act complained of in her petition, before she left appellant's house; and that during said intervening nights she occupied the same bed with him, and up to that time had no thought of leaving him, and did not conclude to leave him until after she had been at her father's house for several days, all of which is more fully shown by the official report of the plaintiff's testimony which is attached to, and made a part of the defendant's motion for new trial."

The proposition under said assignment is as follows:

"Although the appellant may have been guilty of the acts and conduct alleged in the appellee's petition, and testified to by her, she having testified on cross-examination that after the last act complained of had been committed, she continued to sleep with him for three or four nights, and did not decide to quit him until a day or two after she went out to her father's house on a visit, she condoned the wrongs, if any, committed against her, and should have been denied a divorce."

Appellant introduced no testimony and judgment for divorce was based upon the testimony of appellee alone, which is as follows:

"My husband began to treat me badly about two months after we were married. After I became pregnant with child he beat me over the head with his fist, and drove me around with a pistol, in the house, and after that he called me a whore and a son of a bitch, and all such things as that. About six months after we were married he tried to get me to take a box of calomel tablets so that I would miscarry. And he also made me trot up and down the road with a gun in his hands to try to make me miscarry; that was about 11 o'clock at night; and he also called me ugly words, such as whore and son of a bitch at that time. I continued to live with him because I thought he would do better and act like a man. Another time he had negroes on the place and shot craps and played cards with them; that was down near the barn, I could see him. That was about four months after my child was born. He also accused me of being untrue to him, said I was too familiar with other men, which was false, and he also called me a whore, which was false. At the time of our separation, August 7th, he beat me over the head with his fist and called me a lot of bad names; a son of a bitch, a whore and a liar, and thief and negro, and such things as that, and he caught me by the arm and drug me into the kitchen; it was the left arm, and where he wrenched

it, it had spots on it and risings all over it afterwards, and I had risings and sores on my head and about my eyes where he hit me. That all took place about two days before we separated, and I left him as soon after that as I could get away. When he would call me these bad names it would humiliate me. My left arm that he twisted had 13 risings on it after that, and you can see some of the spots on it yet. I always treated him the best I knew how, and tried to manage his household affairs as a wife should, and was always kind and affectionate to him, and never did or said anything to him out of the way in my life. We separated once before this last time, when he first treated me so cruelly, as I have testified about, but I went back to him because I thought he would do better. He promised to do better, but he didn't. These attacks on me and cruel treatment I have testified about would occur at least once a week and some times twice a week. He was a man of violent temper, and he didn't seem to have any control over his passion and temper when he would get mad. In view of his treatment towards me since our marriage and up until the time we separated, it is not possible for us to live together as man and wife, and I never will live with him as long as I live. We had one child while we were married, a girl named Juanita Fay Mahurin, 2 years old now. I have had the child in my possession since our separation. I want to keep the child, and I am willing and able to take care of it. * * * We lived together about 2½ years, and during that time I was kind and affectionate and loved him, and I did not say a harm word to him during that time. Yes; I continued to love him when he would hit me over the head and call me all those bad names, and I didn't say a harm word to him during all that time. He sat on the gallery with his gun and made me run up and down the road to cause me to miscarry; that was about six months after we had been married. Yes, I slept with him that night. No, I didn't say a harm word to him about that, and continued to love him after that. Several times after that he hit me over the head, and called me a whore and a son of a bitch. He didn't hit me over the head with his gun, but with his fist. He always called me those names when he would get mad. No; I didn't say a harm word to him, because I knew better than to. I did not tell my father or any one about it until after we separated. Yes; I took the baby and went home, and have been there ever since we separated the last time. Yes; I want to keep the baby and don't want the baby's father to see it; I don't think he is fit to see it or be with it. No; I don't want the baby to be called Mahurin. Anybody that has done like he has isn't fit to raise a child under no circumstances.

"Q. And that is the man you say you loved for 2 years or more? A. Yes; but I don't love him now under no circumstances, and never will. I quit loving him the day he treated me so bad. The day I quit him he carried me over to his father's, and went on to Itasca, and my brother came there for me and took me over to my father. I didn't say anything to him about leaving him, and it was after I got over to my father's house that I decided to leave him. Q. You did love him up until he left you that day? A. Yes, sir. Q. And when you left Mr. Mahurin's house and started to your father's house with your brother you still loved him? A. Yes, sir. Q. But when you got over to your father's house and stayed there a day or two you quit loving him? A. Yes, sir. My father didn't advise me not to go back to him. I made up my mind to quit him and stay at my father's after I got over there, but they didn't know I had come to stay. Q. Believe you say you loved him after you got to your father's house and until you stayed there a day or two and studied it over? A. Yes. Otho called me the next day after I went home to see when I wanted to come home. I had quit loving him at that time. I told him when he called I wasn't coming home.

"Yes; he has frequently wanted to come to see the baby, but I wouldn't let him. Papa didn't want him on the place. Yes; I objected, too, as well as papa. Yes; I continued to live with him as his wife and forgive him for everything he had done and love him clear up until about the 7th of August, the last time we separated. When I saw him out in the yard shooting craps with the negroes was a while before I went home. No; I am not asking for a divorce on that ground. Yes; I lived with him after I saw him shooting craps with the negroes; yes, lived with him as his wife after each one of these things occurred that I have testified about.

"Q. When was the last time you say he ever struck you or bruised you and called you bad names? A. Three or four days before I come home. Yes; I slept with him that night, and the next night, and did so practically every night clear on up until he took me over to his father's. I didn't leave him before that time because I didn't have any way. Yes; my father and mother were over to see us on Sunday before that Monday he took me to his father's house, but he said I couldn't go back with them. No; I hadn't made up my mind then to quit him. Q. Why didn't you want to live with a man you loved? A. I hadn't decided then. Q. Then it wasn't because you didn't have any way to go that you didn't go? A. No. Q. And you continued to love him up until the day you got over to your father's house and thought it all over? A. Yes, sir. * * * I didn't tell my father about his treatment of me, because I thought he would turn and live a better life and be a man."

In addition to the appellee's testimony her mother, Mrs. J. W. Davis, testified:

"My name is Mrs. J. W. Davis, and I am the mother of Mrs. Dessie Mahurin. I live five miles on the other side of Itasca, and have been living there 21 years. I remember the time my daughter and the defendant married, and I also remember the time when she came home. Since she came back home she has been residing at my home. She came home about 11 o'clock in the morning. When she came home that morning I noticed the condition of her arm; it looked to me like it had been twisted and bruised; looked as though it had been taken and twisted one way and then another, until it was knotty all over, and sores come there

afterwards. * * * Yes; she had some ris-ings on her arm; looked more like risings than anything, but they never would run; look-ed like it was bruised. She was in that shape when she came home, and I expect it was a month before I got them cured. I put poultices on them, and in fact everything that I thought would do them any good. Q. Treat them like risings? A. Yes, sir; they looked just like risings."

[1, 2] The testimony of appellee on cross-examination in relation to why she lived with appellant after the assault on her the last time is inconsistent and somewhat con-tradictory to what she stated on direct ex-amination, and it is upon her testimony that appellant bases his contention that she is not entitled to a divorce. In passing upon this question two issues were submitted by the court to the jury, one asked by appellant as follows:

"After the happening of the acts complained of by plaintiff did the plaintiff continue to live with the defendant as his wife up until the sep-aration? Answer: Yes."

The other issue was:

"After the happening of the assault, if any, by the defendant on the plaintiff on or about the 7th day of August, did the plaintiff voluntarily live and cohabit with the defendant as his wife? Answer: No."

If the living together of appellee and ap-pellant could warrant the inference that they cohabited during that time, we think such presumption is rebutted by the finding in an-swer to the second issue, "No," that they did not cohabit. The jury evidently concluded that during that period there was no cohabi-tation, and if there was cohabitation it was because appellee was so overcome with fear as to be incapable of resistance. There was no testimony of cohabitation. The appellant stands in the position, while being charged with the outrageous offenses against his wife, of making no pretense of an excuse for his acts. The jury were justified in believing that if there was cohabitation, some reason existed; that it was not of her own volition. Besides, the jury are the exclusive judges of the weight of the testimony, and had the right to believe what part of her testimony was true and what was untrue. We are un-der the impression that when appellee was living with appellant after the last assault she was living under some kind of hallucina-tion or abnormal condition that rendered her irresponsible for her conduct. We think the evidence in this case, aside from techni-calities, shows beyond peradventure that justice and right entitle appellee to an affirm-ance of this judgment; and it is so ordered.

Affirmed.