RUSSELL KRUSE, APPELLANT, v. DOROTHY POPOVAC KRUSE, RESPONDENT.—85 S. W. (2d) 214.

St. Louis Court of Appeals. Opinion filed July 26, 1935.

Appellant's Motion for Rehearing Overruled September 10, 1935.

Petition for Writ of Certiorari Denied by Supreme Court October 18, 1935.

*Leahy, Saunders & Walther* and *J. L. London* for appellant.

*August G. Walz* and *Charles A. McIntyre* for respondent.

HOSTETTER, P. J.—This is a suit instituted by the plaintiff on November 18, 1932, in the Circuit Court of the City of St. Louis to annul the marriage between himself and the defendant, which was consummated in said city on May 28, 1932.

For grounds of annulment it was averred in the petition that he was forced to go through with the marriage ceremony by intimidation, threats and through fear of death and great bodily injury at the hands of Peter Popovac, father of defendant, who threatened to shoot him if he did not do so, and, but for such threats he never would have gone through with such ceremony; and it was further averred in the petition that defendant falsely and fraudulently represented to him at and prior to the marriage that she was pregnant by him, when in fact, she was pregnant by another man; that he relied upon such false and fraudulent representations and entered into such marriage by reason thereof, and, but for same, would not have entered into such marriage. It was further averred that the child born to defendant on November 7, 1932, was not his child.

The answer contained a general denial, set up defendant's minority, the appointment of Gilbert Weiss as her guardian *ad litem,* admitted the marriage and the birth of a female child on November 7, 1932, and averred that plaintiff was its father; that prior to December 1931, she was a virtuous girl and that plaintiff seduced her under promise marriage; that he did marry her and rented two rooms to live in and sought to compromise her after marriage by bringing strange men around to their home with the intent of getting rid of her, and only married her to keep from going up the river and saving himself from prosecution; she further asked for support for herself and child, expense money, attorney fees, and costs in the litigation.

We refrain from going into all the sordid details of this unfortunate case. Suffice it to say that there were many contradictory statements made by the witnesses, particularly by the two male adults who so guiltily intrigued with the defendant, the sixteen year old girl, Dorothy Popovac; and her testimony is not, in all respects free from obscurities and contradictions. The two male actors, one thirty and the other twenty-three, contradicted themselves, each other, and the girl.

We are satisfied with the conclusion reached by the painstaking and learned trial judge. A full review of the testimony here, would

only place in permanent form an unpleasant and humiliating narrative, which, in the future would needlessly plague and embarrass the actors in this gruesome triangle, as well as the innocent families involved.

Dorothy, the child wife, became sixteen years of age on the 12th day of January, 1932. On Christmas Eve prior thereto, the plaintiff admittedly deflowered her. [Section 3999, Revised Statutes Missouri 1929 (Mo. Stat. Ann., Sec. 3999, p. 2801), characterizes his act in so doing as rape regardless of whether she consented or not.

This case is similar in that respect to the case of Blankenmiester v. Blakenmeister, 106 Mo. App. 390, 80 S. W. 706, in which it was held in an opinion written by that distinguished jurist, the late Judge Goode, that the plaintiff husband, who sought annulment of a marriage on the ground of duress, having violated a statute in respect to seduction under promise of marriage (now Sec. 4011, R. S. Mo. 1929, Mo. Stat. Ann., Sec. 4011, p. 2813), in marrying to extricate himself from the penalty (which was much less severe than that prescribed by Sec. 3999 supra), his action in consummating the marriage must be held to have been voluntarily made in a legal sense.

This statute (Sec. 3999, R. S. Mo. 1929) has been criticized by criminologists, authorities on domestic relations and juvenile delinquency, advocates of companionate marriages, and others, as being too severe on the male, inasmuch as the penalty for its violation ranges from death as its maximum to two years in the penitentiary as its minimum. The argument advanced being that in some instances the female under sixteen years of age may be biologically a mature woman with all the natural impulses which go with maturity and thereby becoming the sexual aggressor, the pursuer, rather than the pursued, and a snare to the male, making her equally culpable in the commission of sexual sins and indiscretions, and that the courts should be vested with discretionary powers in dealing with such problems. However, notwithstanding undue severities may, in sporadic instances, be meted out to the male, yet, upon the whole we must recognize that the underlying purpose of the statute is a wholesome benignant one, to-wit: the protection of the young, ignorant immature female from just such an unfortunate situation as has developed in the instant case. The welfare of society demands such protection, at least until the female is matured by experience and has reached that age where she is not susceptible to blandishments and importunities, which, if yielded to, may seriously affect her happiness throughout life. It requires moral strength even in the sophisticated to resist importunities of the stronger sex, which is strikingly exemplified by Lord Byron in his description of the amours of Don Juan in besieging Donna Julia, a matured, married matron, who "swearing she'd ne'er consent, consented."

Plaintiff called Feegle as his own witness and, thereby, vouched for his credibility, and, in answer to questions propounded by the court, Feegle testified that plaintiff knew of his relations with defendant prior to the marriage.

Feegle further testified that when they (witness and Kruse) were arrested in May they both admitted to Dorothy's brother that they had been with the girl. He further testified that Kruse had been to the hotel with the girl in December, which was before he (witness) had ever been there with her; that he (witness) did take her to the hotel on January 12, 1932, which the girl told him was her birthday; that Kruse told him that he took the girl to the hotel the last part of January, which was after he (witness) had taken her there. He further testified that before the arrest was made in May he went to the midwife and that Kruse knew of his going and he and Kruse both got the money together; that Kruse was working and he (witness) was not, consequently he was the only one to go.

It may be said to the credit of the girl that when she saw that the midwife was about to perform an illegal operation on her she refused to submit and got up from the table and walked out.

There is no substantial testimony that plaintiff in marrying defendant was coerced by threats of her father. Defendant's father did say, in his first burst of anger at learning of Dorothy's pregnancy, that he would like to kill all three of them, meaning Dorothy, plaintiff, and Feegle, but he had no gun and it wasn't said to either of the men and there was no showing that he ever sought to put it into effect.

Plaintiff testified that three days before he married Dorothy, he was down at her house with his friend, Mr. Bartlesmeyer, and her father told him that if he didn't marry her he would shoot him, and threatened his life if he didn't marry her. The mother, the father and Dorothy, denied this statement and plaintiff did not call Mr. Bartlesmeyer as a witness, hence the trial court had sufficient reason to find against plaintiff on his charge of coercion and duress.

Dorothy's version was, that she went to the hotel with Kruse on the night of December 24, 1931, and that he used rubbers in having sexual intercourse with her, and, on January 12, 1932, she accompanied Feegle to the same hotel under the impression that she was going to meet Kruse and that Kruse was not there and Feegle took advantage of her and had sexual intercourse with her and used preventatives, and that later, in the month of January, the date of which she was not certain at first, but fixed later as January 17, she again went to the hotel with Kruse and had sexual intercourse with him, at which time he did not use rubbers and that at that time he promised to marry her and that those three occasions were the only times she ever had sexual intercourse with any one.

Plaintiff admitted that he was there at the hotel with Dorothy on two different occasions and had sexual intercourse with her each time, to-wit: December 24, 1931, and January 9, 1932, and claimed that he used rubbers the last time but admitted that he did not do so the first time. He based his ideas as to the dates on the assumed names which he adopted in registering and also based his charge that she was with Feegle at the hotel later in January than the 12th on the assumed name under which he claimed that Feegle registered, and that, figuring back from the date of the birth of the child, under his theory, he could not be the father. Feegle, however, did not support him in respect to the name under which he. (Feegle) registered.

The trial court, by reason of its superior vantage ground in seeing the witnesses and observing their demeanor, was in a much better position than we as a reviewing court to separate the wheat from the chaff and to weigh and determine the testimony, and, we therefore, approve its conclusion in denying plaintiff's claim for the annulment of the marriage.

In Henderson v. Henderson, 141 Mo. App. 540, loc. cit. 560, 126 S. W. 203, the court, in discussing the question of fraud in the inducement of marriage, uses this language:

"It would not be good policy to inquire too closely into the motives that induce men and women to marry, and the relative strength of mind of the parties, and of the influence the stronger might have brought to bear upon the weaker to bring marriage about. As far as a court would be justified in going would be limited to the question, was the superior influence such as to substitute the will of the one for the other?"

The general rule, in respect to the sufficiency of testimony to annul a marriage, is stated in 38 C. J., Sec. 131, p. 1354, as follows:

"The burden is on plaintiff to sustain his material allegations, and upon defendant to prove any affirmative defense. In view of the peculiar nature of marriage and the grave consequences attendant upon its subversion, the courts will not grant a decree. of nullity except upon the production of clear, satisfactory and convincing evidence."

The lower court allowed defendant $5 per week as alimony and $3 per week for support of child and $100 by ways of attorneys' fees, which is contested by plaintiff. Plaintiff claims that alimony can only be allowed in divorce suits.

The wife, in this instance, testified that she had no property and, under the law, the plaintiff is legally liable for the support of his wife and his minor child. The fact that plaintiff contests the validity of the marriage and seeks to have it annulled does not alter his obligations for the support and maintenance of his wife and child

so long as the marriage is not annulled. If the wife were contending that the marriage was invalid and seeking an annulment thereof, then a different question would arise, but where she is asserting a valid marriage and undertaking to uphold the validity of same, it seems on reason that she should be entitled to the ordinary allowances. Obligations rest on plaintiff to support the wife and child just the same as if he had made no effort to annul the marriage. The mere fact that he is seeking to annul it does not alter the fact that a valid marriage does exist, and, a valid marriage still existing, he is under the same obligations to his wife and the child as if he were making no effort to have it annulled.

The general rule is stated in 38 C. J., Sec. 137, p. 1358, as follows:

"As a general rule the right to alimony depends on a valid and subsisting marriage, since without this there is no obligation for the support of the alleged wife, and before it can be claimed or allowed the marriage must be proved or admitted, or, if it is contested, there must appear to the court a fair probability that it will be established. Hence, while there is some authority to the contrary, according to the general rule, where a wife brings suit for the annulment of the ostensible marriage, thereby denying the fundamental fact on which a claim for alimony should be based, no allowance can be made for her support pending the action, or for suit money, unless it is authorized by a statute. On the other hand, where the husband brings the suit and the wife defends, asserting the validity of the marriage, she is in position to claim alimony *pendente lite* and an allowance for the expenses of the suit and for counsel fees, and it will be granted to her on a proper showing, in virtue of the general equity jurisdiction of the court."

In Ritayik v. Ritayik, 202 Mo. App. 74, loc. cit. 80, 213 S. W. 883, this court, in awarding plaintiff a divorce on the ground that at the time of the solemnization of the marriage the wife was pregnant by another man, of which plaintiff husband was ignorant at the time, approved an allowance made by the trial court in favor of the wife of suit money and attorneys' fees.

It therefore follows that the plaintiff's objections to the allowances made by the lower court are overruled, and it follows that the judgment of the lower court ought to be, and is hereby, affirmed. *Becker* and *McCullen, JJ.,* concur.