251 S.W.2d 329 (1952)
KENDRICK
v.
KENDRICK.
No. 28390.
St. Louis Court of Appeals, Missouri.
September 16, 1952.
Rehearing Denied October 17, 1952.
*330 S. R. Redmond, Henry D. Espy, St. Louis, for appellant.
Morris A. Shenker, Bernard J. Mellman, St. Louis, for respondent.
WOLFE, Commissioner.
This is an action in which the plaintiff sought a decree of separate maintenance and the defendant sought a decree of divorce upon a cross bill. The trial court found for the plaintiff, awarding her separate maintenance and directing the defendant to pay her $75 per month. The court also awarded $300 attorney's fees to the plaintiff in addition to a prior award of $250 for that purpose. The defendant, whose cross bill was dismissed, prosecutes this appeal.
Plaintiff sued on the theory that she had been constructively abandoned by the defendant in that her condition as his wife was rendered intolerable by his action toward her and that she was forced to leave him. As to a failure to provide she alleged that the defendant refused to pay her doctor bills and failed to give her sufficient money for her personal needs.
The defendant charged in his cross bill that the plaintiff constantly nagged, refused to perform her duties as a wife, embarrassed him in public, and threatened him with a knife.
The parties are colored people, which fact is stated only for the reason that it is germane to one of the issues raised by the evidence.
The plaintiff is a woman forty years of age, who prior to her marriage to the defendant operated a beauty parlor in Detroit, Michigan. The defendant is sixty-four years of age and engages in the practice of dentistry in the City of St. Louis. They were married in Michigan in 1948, after a brief acquaintance with each other, and they then took up their residence in the quarters the doctor had occupied as a bachelor prior to his marriage. In the front part of their home was the doctor's office and a hall used at times as a waiting room for his patients, and for their living quarters they had a bedroom, kitchen and living room. During office hours the living room was used at times as a waiting room. According to the defendant the *331 plaintiff visited in his home before their marriage and expressed full satisfaction with it.
The plaintiff stated that she took care of the defendant's instruments, kept his records, and acted as a receptionist for him. This the defendant denied, and when the plaintiff was shown the appointment books that she said she had kept, she could find but a few notations in her own handwriting.
Plaintiff charged that the defendant failed to properly support her in that he only gave her $3 or $4 a week for spending money. He purchased the groceries and there was always a sufficient amount of food in the house. She did not complain of a need for clothing of any kind, but rested her proof of the defendant's failure to support her on the fact that he closed his charge accounts with the department stores in the summer of 1949. The defendant stated that after a year's bill of about $700 at one store, he told his wife that he could not afford to keep the account open and at the same time give her money. He stated that he gave her $25 to $30 a month. Plaintiff also testified that the defendant refused to pay the hospital and doctor bills incurred when she was obliged to undergo an operation in 1950. When it was decided that she needed an operation, her husband sent her to a physician of his acquaintance and reserved a room for her in St. Mary's Hospital. The plaintiff refused to go to St. Mary's Hospital or to allow the physician to whom her husband had sent her to perform the operation.
According to the defendant she said she would have no Negro doctor treat her. Instead she consulted a doctor whom her husband did not know and went to Barnes Hospital. She stated that the defendant only came to see her once while she was so confined but the defendant said that he called three times and would have called frequently except for the embarrassment that he felt in going to a hospital which maintained a separate ward in the basement for colored patients and a separate entrance for them. This was not true of the hospital where he had reserved a room for her and he stated that she could have had any doctor that she wanted if she had gone to St. Mary's and that he so told her.
According to the plaintiff the defendant refused to take her to Barnes Hospital, but his version of the affair is that while they were still in disagreement about where she should go for the operation, he left the house and when he returned his wife was gone. He did not know at once that she had gone to the hospital, for, according to him, she had left once before without notice and had gone to Chicago so he concluded that she might have done it on this occasion.
A cousin of Mrs. Kendrick was called to corroborate her testimony relating to the doctor's refusal to take his wife to the hospital. This witness stated that she was in the Kendrick home when Mrs. Kendrick asked her husband to take her to Barnes Hospital, but he refused to do so, and shortly thereafter left the house. She testified, however, that Kendrick always treated his wife well in her presence.
The defendant did not pay the doctor and hospital bills and, as stated, it was upon his failure to do so and the closing of the charge accounts that the plaintiff sought to prove that he had failed to provide for her. The defendant stated that he had not paid the bills in question because he had made suitable provision for his wife's medical care which she had declined to accept.
As for the conduct of her husband that made her condition as his wife intolerable, plaintiff asserted that on two occasions the defendant charged her with associating with other men, but this apparently was her own construction of a statement made to her by the defendant. He told her twice that it was not becoming for a woman to be out after dark by herself, and from this she apparently concluded that he was charging her with association with other men. Defendant testified that he never questioned nor had any doubt about the fidelity of his wife.
Plaintiff also charged that defendant associated with other women. This she sought to support by the fact that a Miss Ousley, a school teacher, with whom the *332 defendant had gone prior to his marriage, wrote a letter to the defendant after his marriage and the defendant showed the letter to plaintiff. The defendant phoned Miss Ousley on occasions and the plaintiff listened to his conversations and drew her own conclusions as to what Miss Ousley was saying. The defendant's explanation of these telephone conversations was that Miss Ousley continued to be a patient of his and he only called her about work that he was doing for her. The other charge relating to infidelity was that the defendant went on a fishing trip with a Mrs. Utley. The Utleys were also patients of the doctor, and, according to him, it had been arranged for Mr. and Mrs. Utley, another couple, his wife and himself to go to St. Charles on a one-day fishing trip. Plaintiff would not go and Mr. Utley was called out of town so it resulted in the defendant taking Mrs. Utley and going fishing for the day with another couple. Plaintiff said that she was not invited and she made much ado about the fact that Mrs. Utley on another occasion had sent a post card to the defendant. It was the ordinary souvenir card and was sent while the Utleys were away on a trip and it offended the plaintiff only in that it was not addressed to her as well as to her husband.
Another complaint was that her husband went out nights and did not tell her where he had been, but he testified that he did on occasions visit patients and would have taken his wife with him but she would not go. He also attended professional meetings at night.
The defendant in support of his cross bill testified that shortly after their marriage he took his wife on a long trip to Canada. He said that they frequently attended the St. Louis Municipal Opera, baseball games, social and church affairs. He had an old automobile and it was a period of time when new cars were difficult to get. His wife continually insisted that he should buy a Cadillac which the defendant considered beyond his means. She also wanted a maid and the defendant hired a woman to come in and do the housework. Plaintiff also wanted defendant to buy a bungalow.
Defendant stated that on one occasion they were both to attend a banquet and that plaintiff hid the key to the wardrobe where his clothes were locked away and would not give it to him so he could not attend. She denied having hidden the key and said that the defendant twisted her arm to make her tell where the key was. She then left the house and came back with a policeman. Defendant denied that he had twisted her arm or in any way exerted physical violence upon her and was greatly embarrassed about having a policeman called in for he enjoyed a good reputation in the community and nothing like that had ever occurred before.
As to the incident relating to the post card sent to him by Mrs. Utley, the defendant testified that when Mr. and Mrs. Utley returned to St. Louis plaintiff called up Mr. Utley and told him that her husband was having an affair with his wife and Utley came over to the defendant's house and asked plaintiff what proof she had of her charges. Whereupon she showed him the post card, such as are frequently sent to friends and acquaintances by those on vacation trips.
On one occasion the plaintiff came to the defendant's office while he was treating a patient and demanded to know if that woman had been there. She had a knife in her hand and was threatening according to the defendant. This was corroborated in part by the testimony of the patient the doctor was treating at the time.
Two of the women who worked for the defendant as maids testified that the plaintiff was a demanding person; that she spent most of her time in bed and openly proclaimed that she was not going to do anything but let the defendant take care of her.
Both plaintiff and defendant testified that the other had suggested a divorce as the only solution to their difficulties, but the plaintiff left and established herself at the Y.W.C.A. She employed a lawyer and brought suit after which she informed her lawyer that she wanted a reconciliation and when this was not effected she discharged him and employed counsel who represented her at the trial and on appeal.
*333 When this suit was originally brought, plaintiff sought a divorce but later amended her petition and asked that separate maintenance be granted to her. The defendant contends that the court erred in granting separate maintenance because it was a new and different relief than that sought by the action for divorce originally instituted. It was decided in the case of State ex rel. Fawkes v. Bland, 357 Mo. 634, 210 S.W.2d 31, that a wife, who was the defendant in a divorce action, could counterclaim for separate maintenance, and we see no reason why she should, as a defendant, have a greater scope of relief than that which would be available to her as a plaintiff. Both divorce and separate maintenance involve the conduct of the husband, so the subject of the action is the same and the amendment of the original petition for divorce was permissible. The rule relating to departure was abrogated by the new Code. White v. Sievers, 359 Mo. 145, 221 S.W.2d 118. Therefore the court did not err in trying the case upon plaintiff's amended petition.
It is asserted that the court erred in granting separate maintenance to the plaintiff for the reason that there was neither proof that the defendant had abandoned the plaintiff nor that he had refused to support her. These are both requisite elements of such actions. Hoynes v. Hoynes, Mo.App., 218 S.W.2d 823; Remley v. Remley, Mo.App., 208 S.W.2d 807; Herbig v. Herbig, Mo.App., 245 S.W.2d 455. In passing upon the challenged sufficiency of the evidence to meet the required proof, this court makes its own finding and reaches its own conclusions upon a review of the testimony. Hoynes v. Hoynes, supra.
As to the alleged abandonment the plaintiff relies upon the theory of constructive abandonment which arises when a husband offers such indignities to his wife that she is justified in refusing to live with him, Remley v. Remley, supra, and the indignities are such as would entitle her to a divorce in a suit seeking that relief. Elsey v. Elsey, Mo.App., 297 S.W. 978.
The evidence of the indignities upon which the plaintiff relies have been set out. Her charges that her husband accused her of associating with other men is wholly without proof. The alleged infidelity of the defendant falls short of proof in the light of the plaintiff's own admission that she was jealous and in view of the great commotion she raised because her husband received an innocent post card greeting from a woman patient. The defendant showed the plaintiff the letter he received from Miss Ousley, his former sweetheart, and such conduct does not connote infidelity which is by its nature clandestine. The same is true of the innocent outing the defendant attended with Mrs. Utley when he went with her and others on the fishing trip from which he returned early the same day. The defendant went out occasionally at night, and since all of his working hours were spent in his home it it quite natural that he should go out. Marriage does not make the home a jail, nor either spouse the jailer of the other. As to the row that arose at the time the wardrobe was locked and the key was missing, the plaintiff said the defendant twisted her arm. One act such as this, if true, is not proof of general indignities, for it does not indicate a settled hate or ill will toward the plaintiff. Chapman v. Chapman, Mo.App., 230 S.W.2d 149.
It appears that there was no showing sufficient to bring the plaintiff's situation within the theory of constructive abandonment, for, upon analysis, all her evidence of indignities is trivial and without consequence. Nor does the evidence prove her charge of failure to support her, but we need not elaborate upon this, since absent abandonment which she failed to prove, she was not entitled to separate maintenance and the decree awarding it should not stand.
It is also urged that the court erred in denying the defendant a divorce upon his cross bill. It appears from the evidence that he was subjected to a series of indignities that were certainly intolerable. He was a person of rather modest income *334 for a professional man, earning about $5,000 a year. He had accumulated some savings and lived within his means, but his wife seemed to set out from the time of their marriage to live on a scale that would have been lavish according to the standards to which her husband had been accustomed. We need not restate the evidence, but there was an abundant proof that she was a nagging, faultfinding, accusing, unsociable, and grasping person, who, although married to a man twenty some odd years her senior, sought to make him live as she wanted. The incidents of calling the police and refusing to accept the hospital arrangements made for her by her husband were things that undoubtedly caused, and were designed to cause, great embarrassment to the defendant.
The equities in this case appear to be on the side of the defendant, and since he was the innocent and injured party the court erred in denying his cross bill for divorce.
One other point raised relates to the allowance of attorney's fees. The defendant asserts that the court erred in making an allowance of $300 for the services performed by the lawyers who tried the case when a previous sum of $250 had been allowed and paid for the services of a lawyer discharged by the plaintiff prior to the trial.
It is certainly true that a husband should not be required to pay an additional attorney's fee every time his wife decides to change lawyers, but there is nothing to indicate that the second award was made for this reason. The fixing of the amount to be allowed as attorney's fees is within the discretion of the trial court. Padgett v. Padgett, Mo.App., 231 S.W.2d 207. This was a long contested case requiring considerable time to try and the action of the court in awarding fees in the total amount of $550 does not indicate any abuse of the discretion with which it is vested.
For the reasons stated, it is the recommendation of the Commissioner that the judgment be reversed and the cause remanded with directions to enter a judgment for the defendant on the plaintiff's petition; that the defendant be awarded a decree of divorce; and that the plaintiff recover of the defendant $300 for her attorney's fee.
PER CURIAM.
The foregoing opinion of WOLFE, C., is adopted as the opinion of the court.
The judgment of the circuit court is accordingly reversed and the cause remanded with directions in accordance with the recommendation of the Commissioner.
BENNICK, P. J., and ANDERSON and WEBER, JJ., concur.