Lela Mae FORBIS, by her guardian, Joel Davis, Plaintiff-Respondent,

v.

Jim S. FORBIS, Defendant-Appellant.

No. 7337.

Springfield Court of Appeals.
Missouri.

Jan. 8, 1955.

Motion for Rehearing or to Transfer
Overruled Jan. 25, 1955.

Sater & Monroe Monett, Roy Coyne, Joplin, for defendant-appellant.

Ruark & Ruark, Neosho, for plaintiff-respondent.

STONE, Judge.

In this suit for separate maintenance, defendant appeals from the judgment directing him to pay $100 per month to plaintiff. In her amended petition plaintiff alleged that she and defendant "first entered into a common law marriage in * * * 1933" which was "legally consummated by legal ceremony on the 12th day of February, 1951"; that plaintiff and defendant lived together as husband and wife from 1933 to 1952, when "the defendant cast the plaintiff out of the home"; that defendant "caused an affidavit to be signed declaring that she was of unsound mind and thereafter attempted to have plaintiff sent to an insane asylum"; "that after her discharge on such occasion the defendant has refused to permit the plaintiff to return to said home"; and that, "after having cast the plaintiff out," defendant has failed and refused to support and provide for her.

In his answer defendant admitted "that he and the plaintiff were married on the 12th day of February, 1951, and continued to live together until * * * 1952" but denied all other allegations in the amended petition. After most of the evidence had been taken, defendant filed an amended answer in which "by way of cross-complaint" he alleged that "the plaintiff * * has introduced testimony disclosing that at the time of the entering into such alleged marriage ceremony * * * the plaintiff was insane," pointed out that "under the statute (Section 451.020) an insane person cannot enter into a marriage contract," and prayed for a decree "declaring the marriage * * * null and void." (All statutory references are to RSMo 1949, V.A.M.S.) Defendant here presents two primary contentions, i. e., that the marriage of February 12, 1951, was by reason of plaintiff's alleged insanity "absolutely prohibited and void," and that "plaintiff did not show an abandonment by the defendant and such state of facts as would warrant a judgment for separate maintenance."

Prior to their ceremonial marriage on February 12, 1951, plaintiff and defendant had been "living together" and "occupying the same bed" for about fifteen years; but, plaintiff's several offers of proof pertaining to that period were denied by the court because common law marriages contracted after 1921 are not recognized in Missouri. Laws of 1921, p. 468, Section 451.040(5). The incident, which led to institution of the insanity proceeding mentioned in plaintiff's amended petition, occurred on January 2, 1952, and was described thus by defendant: "I was reading in the front room * * *. She begin pecking me in the face * * * she didn't peck me hard, so I went in the kitchen and she kept on and went back in the bedroom and come around where I was reading again and she kept doing that. I think, 'I will get on my shoes and get out.' It was * * * awful cold, so I got on one overshoe and * * * I started to

put on the other one and she jerked it out of my hand and hit me in the head with something. It kind of addled me a little and she grabbed a butcher knife and started at me. I jumped out and run." He stayed that night with Herb Griffith. On the following day, defendant went to T. M. Griffith, plaintiff's father then 82 or 83 years of age, and "told him about the deal." Then, "we come up here to the sheriff's office" and "we told the sheriff he would have to do something with her." The information filed that day in the probate court, charging that plaintiff was "insane" and "dangerous to the safety of the community by being at large," was signed by plaintiff's father. Upon the warrant issued, plaintiff was arrested and was confined overnight in the county jail.

Plaintiff, two of her brothers, her counsel and defendant appeared in probate court on January 4, 1952, and the sanity hearing set for that date was, "for good cause shown, * * * continued indefinitely." On February 25, 1952, this insanity proceeding was dismissed. Plaintiff's brothers testified that defendant had stated in probate court on January 4, 1952, that "he didn't want her (plaintiff) back" and that "he asked that the (probate) court keep her away * * * from his home." According to defendant, he "didn't have a word to say" in probate court until the others left, when "I did ask the judge, 'What will I do now if she comes back out there?', and he says, 'Call the sheriff—he will take her away.'" Plaintiff left the probate court on January 4, 1952, with her brothers, and from time to time thereafter she lived in one of their homes, or with her father, or alone in the rooming house of Mrs. Ruby Edwards (from April 1 to June 19, 1952), or alone in a separate two-room apartment (for five or six months prior to trial in November, 1953). For a period of about two months prior to May 19, 1953, plaintiff was in Robinson Neurological Hospital in Kansas City, Missouri, where she was given "shock therapy". On July 3, 1953, plaintiff was adjudicated as "a person of unsound mind" in the Probate Court of Jasper County;

and on July 13, 1953, Joel Davis was appointed as "guardian of the person and estate" of plaintiff. This suit has been prosecuted thereafter by the guardian on behalf of his ward. Section 458.310; Redmond v. Quincy, O. & K. C. R. Co., 225 Mo. 721, 126 S.W. 159, 161(1).

The only medical witness was Dr. Wm. T. McNew of Carthage, a general practitioner who, however, had done "some work in a mental institution in 1934." This witness, who had been plaintiff's attending physician for 6½ years prior to trial, "had treated her primarily for organic diseases (not named or described) rather than mental illness." At the request of her brothers, Dr. McNew had examined plaintiff at the county jail on the morning of January 4, 1952. His opinion was that "although she was of unsound mind she was not violent" and that there was no reason to confine her. When asked "what particular type of mental disorder she is afflicted with," Dr. McNew replied "I think (she is) the mixed type schizophrenic." Although he found this "very difficult * * * to explain," he said that "she is definitely mixed up on some things—her reactions," but that he had never observed any tendency to violence or any persecution complex. Without objection, Dr. McNew commented that "I agree with the neurologist who saw her * * * as of last May (1953)," and then expressed his (McNew's) opinion that "she is able to carry on in the community without being confined in the hospital." The doctor frankly stated on cross-examination that, in his opinion, plaintiff had "become *mentally ill* * * * much before 1951" and that "for years" she had been "*a mental problem*," but painstaking perusal establishes that his testimony went no further than this with respect to plaintiff's mental condition prior to January, 1952.

Since defendant pleaded no "special or affirmative matter of a recriminatory nature," his general denial of plaintiff's cause of action afforded no basis for evidence of alleged misconduct by plaintiff offered in justification of defendant's ac-

tion. Farley v. Farley, Mo.App., 181 S.W. 2d 671, 674(5–7). However, over objections of plaintiff's counsel predicated not only on that principle but also on the well-established general rule that conversations between husband and wife, when others are not present, constitute confidential communications and as such are privileged and inadmissible in evidence [Section 491.020; Allen v. Allen, Mo.App., 60 S.W.2d 709, 711(1); McPheeters v. McPheeters, 207 Mo.App. 634, 227 S.W. 872, 873(1)], considerable testimony otherwise inadmissible was received solely "on the theory of (it) going to the question of her (plaintiff's) mental capacity." Although we have considered carefully the evidence so admitted, we do not extend this opinion by detailed statement thereof because all of such evidence (if competent) pertained to alleged statements or incidents closely preceding institution of the insanity proceeding on January 3, 1952, and for the purposes of this opinion we are assuming, in accordance with defendant's insistence, that plaintiff was of unsound mind *at that time.*

However, it by no means follows that the ceremonial marriage of February 12, 1951, was "prohibited and void" under Section 451.020. For, whether the parties to a contract of marriage are mentally competent vel non to enter into that contract must be determined *as of the date of the marriage* [Henderson v. Ressor, 141 Mo.App. 540, 126 S.W. 203, 208(2); Westermayer v. Westermayer, 216 Mo. App. 74, 267 S.W. 24, 26(2); Smoot on Law of Insanity, Section 409, p. 339]; and, evidence concerning the mental condition of either party prior or subsequent to such date is of probative value only insofar as it raises a reasonable inference as to the mental condition of such party at the time of marriage [Glover v. Bruce, Mo., 265 S.W.2d 346, 352(2); Smith v. Fitzjohn, 354 Mo. 137, 188 S.W.2d 832, 833–834 (3,4); Walter v. Alt, 348 Mo. 53, 152 S.W. 2d 135, 142(10)].

That plaintiff was of unsound mind on January 4, 1952, raises no inference or presumption, upon the record be-fore us, that the same mental condition existed on February 12, 1951. For, although a showing of the existence at one time of a certain condition of a continuing nature permits of a presumption that such condition continues to exist until the contrary is shown [Donnelly Garment Co. v. Keitel, 354 Mo. 1138, 193 S.W.2d 577, 581(2); Ruckels v. Pryor, 351 Mo. 819, 174 S.W.2d 185, 198–199(7); Missouri Power & Light Co. v. City of Bucklin, 349 Mo. 789, 163 S.W.2d 561, 564(2)], the general rule is that proof of present existence of a condition standing alone is not presumptive evidence that the same condition existed theretofore, since inferences of fact and presumptions usually do not run backward [Glover v. Bruce, supra, Mo., 265 S.W.2d loc.cit. 353; Nash v. Normandy State Bank, Mo., 201 S.W.2d 299, 303(6); Snowwhite v. Metropolitan Life Ins. Co., 344 Mo. 705, 127 S.W.2d 718, 722(4); Conduitt v. Trenton Gas & Electric Co., 326 Mo. 133, 31 S.W.2d 21, 26(13, 14)]. It being a matter of common knowledge that insanity may be transient [Smoot on Law of Insanity, Section 16(c), p. 9], the instant situation is not within the exception to the general rule that, "where the condition or state of facts at any given time would ordinarily not have existed except for its existence at a prior time, * * * the necessary inference may be indulged retrospectively". Bolomey v. Houchins, Mo.App., 227 S.W.2d 752, 758 (7).

As defendant emphasizes, Section 451.020 provides that "(a)ll marriages * * * between persons either of whom is insane, * * * are prohibited and declared absolutely void". But, "insanity" is "difficult to define, and proof of its existence is largely one of fact based upon the particular facts and circumstances of each case. There is no clear dividing line between competency and incompetency * * *." Ertel v. Ertel, 313 Ill.App. 326, 40 N.E.2d 85, 88(4). "The term insanity * * * as used generally has various shades of meaning. It differs in kind and character and is not subject to a precise definition universally applicable." Ashley

v. Pescor, 8 Cir., 147 F.2d 318, 320. "Indeed, insanity and mere peculiarity of temperament shade into one another so nicely that it might puzzle the most learned to tell just where one leaves off and the other begins; who is insane, and who is not. As has been said, with much truth as well as humor, 'All the world art queer, but thee and me, and thou art queer sometimes.'" Smoot on Law of Insanity, Section 10, p. 6.

 Although the term "insanity" may be incapable of precise definition, examination of numerous cases and texts compels, we believe, the conclusion that one is not "insane" within the contemplation of Section 451.020, who has sufficient mental capacity, at the time of marriage, to comprehend and understand the nature and effect of the marriage contract and the duties and obligations thereby assumed by the contracting parties.[1] We need not and do not here determine whether, as has been sometimes indicated,[2] less mental capacity is required to enable a person to enter into a contract of marriage than is required to contract generally; but certainly "no greater, if as much, mental capacity is requisite to make binding a matrimonial contract, than is requisite for ordinary business contracts."[3] 35 Am.Jur., Marriage, Section 18, p. 190.

 Compelling considerations of common sense and public policy support the principles that the presumption of validity of a marriage is one of the strongest known to the law [Maier v. Brock, 222 Mo. 74, 120 S.W. 1167, 1174(4)]; that every person is presumed to be sane until the contrary is shown [Fendler v. Roy, 331 Mo. 1083, 58 S.W.2d 459, 464(6); Reynolds v. Maryland Casualty Co., 274 Mo. 83, 201 S.W. 1128, 1131(2); Rapp v. Rapp, Mo. App., 238 S.W.2d 80, 91(11)]; that the burden of proving the invalidity of a marriage rests upon him who asserts such invalidity [Osmak v. American Car & Foundry Co., 328 Mo. 159, 40 S.W.2d 714, 717(1), 77 A.L.R. 722; Ribas v. Stone & Webster Engineering Corporation, Mo. App., 95 S.W.2d 1221, 1224(3); Griggs v. Pullman Co., Mo.App., 40 S.W.2d 463, 464(2)]; and, that a marriage will not be declared invalid except upon clear, cogent and convincing proof [Smith v. Smith, Mo., 237 S.W.2d 84, 90(15); Carr v. Carr, Mo., 232 S.W.2d 488, 489(3); Henderson v. Ressor, 265 Mo. 718, 178 S.W. 175, 179; Kruse v. Kruse, 231 Mo.App. 1171, 85 S.W. 2d 214, 216(2)]. More specifically, there

---

1. Westermayer v. Westermayer, 216 Mo. App. 74, 267 S.W. 24, 26(3); Ertel v. Ertel, 313 Ill.App. 326, 40 N.E.2d 85, 88–89(5, 6), 89(12); Annotation, 28 A.L.R. 635; Annotation, 40 L.R.A. 737; Schouler on Marriage, Divorce, Separation and Domestic Relations (6th Ed.), Vol. 2, Sections 1100–1102, pp. 1368–1370; Nelson on Divorce and Annulment (2nd Ed.), Vol. 1, Section 8.04, p. 333; Keezer on Marriage and Divorce (3rd Ed.), Section 446, p. 492; Bishop on Marriage, Divorce and Separation, Vol. 1, Sections 595–601, pp. 255–259; Peterson, Haines & Webster on Legal Medicine and Toxicology (2nd Ed.), Vol. 1, pp. 1062–1063; Wharton & Stille's Medical Jurisprudence (5th Ed.), Vol. 1, Section 41, p. 42.

2. Payne v. Burdette, 84 Mo.App. 332; In re Guthery's Estate, 205 Mo.App. 664, 226 S.W. 626, 628; Ertel v. Ertel, supra, 40 N.E.2d loc. cit. 89; Annotation, 28 A.L.R. 635, 644(IV); Bishop on Marriage, Divorce and Separation, Vol. 1, Section 597, p. 256.

3. There is no basis for an adjudication of insanity "unless it is shown that his (the subject's) powers of reasoning and comprehension have been so far destroyed or reduced by mental weakness * * * that he is incapable of knowing and appreciating the nature and consequences of his acts in respect to his own conduct and the management of his property." In re Delany, Mo.App., 226 S.W.2d 366, 373(6). See also In re Bearden, Mo.App., 86 S.W. 2d 585, 594(12, 13); Harrelson v. Flournoy, 229 Mo.App. 582, 78 S.W.2d 895, 899 (4). And, "'to invalidate an act or a deed of a person (for want of mental capacity), it is not sufficient to merely show that he or she * * * is possessed of a mental weakness. One must go further, and show that the person does not possess sufficient mind to understand, in a reasonable manner, the nature and effect of the act in which he is engaged.'" Weakley v. Weakley, 355 Mo. 882, 198 S.W.2d 699, 702; In re Nelson's Estate, Mo.App., 185 S.W.2d 890, 895(1).

is a general presumption "that a person who has entered into a marriage was mentally capable of legally contracting it, and the burden is on the party alleging mental incapacity to prove it." 35 Am.Jur., Marriage, Section 113, p. 251; anno. 28 A.L.R. 635, 652(IX). "A contract of marriage is not lightly to be pronounced void on the ground that one of the parties was insane and incapable of contracting." Slais v. Slais, 9 Mo.App. 96, 97.

■■■ Of course, when evidence on any given issue comes into a case, all presumptions with respect to such issue vanish [Edwards v. Business Men's Assur. Co. of America, 350 Mo. 666, 168 S.W.2d 82, 90(13); State ex rel. United Mut. Ins. Ass'n v. Shain, 349 Mo. 460, 162 S.W.2d 255, 263(11)]. But there is in the instant case no evidence as to plaintiff's mental capacity *at the time of the ceremonial marriage on February 12, 1951,* or for that matter at any time near that date. The generalized statements of Dr. McNew (upon which defendant relies) that plaintiff had "become *mentally ill* * * * much before 1951" and had been *"a mental problem"* for years do not show *insanity* on February 12, 1951 [Rapp v. Rapp, supra, 238 S.W.2d loc.cit. 86–87, 92], for, as has been well said, "mental capacity may be co-existent with mental illness" [McElroy v. Lynch, Mo., 232 S.W. 2d 507, 514]. Furthermore, when asked on cross-examination "I believe you said you thought she was insane * * * how long ago did you first come to that conclusion," defendant answered, *"Well, I expect it was four months or something like that before we had her took away (on January 3, 1952)."* We think it clear that defendant failed to prove that plaintiff was insane at the time of the marriage on February 12, 1951, and that the trial court properly refused to declare that marriage "null and void."

■■■ To recover in a statutory action for separate maintenance [Section 452.130], the plaintiff wife must show, by a clear preponderance of the evidence [Glick v. Glick, 226 Mo.App. 271, 41 S.W.

2d 624, 626(3)], the two essential elements of that cause of action, i. e., that her husband has abandoned her without good cause and that he has refused or neglected to maintain and provide for her [Kendrick v. Kendrick, Mo.App., 251 S.W.2d 329, 333(2); Knese v. Knese, Mo.App., 217 S.W.2d 394, 398(1)]. There is no serious contention on appeal that plaintiff failed to show refusal or neglect to maintain and provide for her after January 4, 1952, but defendant insists that the element of abandonment was not proved. Abandonment may be either actual or constructive. If actual, the wife must prove three things, i. e., cessation without good cause from cohabitation, intention on the deserter's part not to resume the same, and absence of complainant's consent to the separation. Thomason v. Thomason, Mo.App., 262 S.W.2d 349, 351(2); Remley v. Remley, Mo.App., 208 S.W.2d 807, 814(2); Reeve v. Reeve, Mo.App., 160 S.W.2d 804, 807 (1); Carder v. Carder, 227 Mo.App. 1005, 60 S.W.2d 706, 707(1); Broaddus v. Broaddus, Mo.App., 221 S.W. 804, 805(4). If constructive, the wife must establish such indignities by the husband as to justify her in refusing to live with him. Kendrick v. Kendrick, supra, 251 S.W.2d loc.cit. 333 (4); Brooks v. Brooks, Mo.App., 211 S.W. 2d 65, 69(4). And, it is stated broadly that she cannot prevail in an action for separate maintenance unless she proves facts which would entitle her to a divorce, if that were the relief sought. Ellis v. Ellis, Mo., 263 S.W.2d 849, 853(4); State ex rel. Fawkes v. Bland, 357 Mo. 634, 210 S.W.2d 31, 35(3); Dietrich v. Dietrich, Mo.App., 209 S.W.2d 540, 544(6); Meredith v. Meredith, Mo.App., 166 S.W.2d 221, 223(1).

■■■ In cases tried on the theory of constructive abandonment (as defendant says the instant case was), it has been recognized consistently that, when the husband's misconduct has rendered his wife's condition unendurable, she may live apart from him without forfeiting her right to separate maintenance. Dietrich v. Dietrich, supra, 209 S.W.2d loc.cit. 544(5); Perkins v. Perkins, 236 Mo.App. 616, 157

S.W.2d 253, 258; Broaddus v. Broaddus, supra, 221 S.W. loc.cit. 807; Polster v. Polster, 145 Mo.App. 606, 123 S.W. 81, 82; McGrady v. McGrady, 48 Mo.App. 668, 674(1). "And where a husband wrongfully drives his wife from him, and turns her out of doors, such conduct must perforce constitute an abandonment of her." Kindorf v. Kindorf, 178 Mo.App. 635, 161 S.W. 318, 320(4). We think it plain in the instant case that, as charged in plaintiff's amended petition, defendant refused to permit his wife to return to the family home after January 4, 1952, and that he abandoned her in law and in fact. That plaintiff's brothers cared for her after January 4, 1952, affords no valid basis for defendant's bitter complaints about the brothers "assuming control, charge and custody of the plaintiff." For, both brothers testified that, before the instant suit was filed, they had asked defendant "what he wanted to do toward taking care of her" and that defendant always said that "he would have to study it over." When, at a hearing on November 14, 1952, prior to plaintiff's treatment in the Robinson Neurological Hospital, defendant was asked whether he was "willing to send her (plaintiff) to * * * any hospital recommended by her doctor," he responded in similar vein that "in the conditions I would have to study this over." Furthermore, the record demonstrates beyond room for reasonable argument that plaintiff's brothers did not prevent their sister from returning to defendant and that he lived separate and apart from plaintiff after January 4, 1952, because he voluntarily chose to do so. For, defendant admitted that plaintiff frequently had asked to "come back home"—"she is hardly ever there, but what she does"—but that her requests had been refused because "I am afraid to stay there with her."

However, there is abundant evidence that defendant had no sound reason to be "afraid" of her. The uncontradicted medical testimony was that plaintiff had no tendency to violence and was "able to carry on in the community without being confined in the hospital." The officers who arrested plaintiff on January 3, 1952, testified that she "gave us no trouble at all—she never screamed or nothing like that," that she was not violent, and that her conduct was "perfectly ladylike." When asked whether plaintiff had "shown any violence toward you" prior to the uncorroborated "butcher knife incident" on January 2, 1952, defendant said "nothing to speak of really before that"; and, when testifying about plaintiff's visits to his home after January 4, 1952, defendant said "she has been there back and forth and has behaved herself good while she was there." Finally, it is of more than passing significance that defendant admittedly was not so "afraid" of plaintiff but that he frequently had sexual intercourse with her subsequent to January 4, 1952, and following each such occasion took her in his automobile to a point "southeast of the square—about two blocks" where he left her without (as he said) ever learning where she was living.

We are not persuaded by defendant's further argument that plaintiff condoned her husband's indignities by her sexual indulgence with him. "It is essential to condonation that there be an intention to condone, either actual or presumed from the conduct of the injured party" [17 Am.Jur., Divorce and Separation, Section 204, p. 252]; and, since forgiveness is an essential element of condonation, it is often said that condonation is a state of mind or an act of the mind [annotation, 32 A.L.R.2d 107, 123; Nelson on Divorce and Annulment (2nd Ed.), Vol. 1, Section 11.02, p. 376]. Compare Ratcliff v. Ratcliff, 221 Mo.App. 944, 288 S.W. 794, 796(5). Whether there has been condonation must be determined in the light of the facts of each particular case [Weber v. Weber, 195 Mo.App. 126, 189 S.W. 577, 578]; and, even though the mental competency of the wife be not questioned, a mere showing of subsequent sexual intercourse may not establish condonation, where the husband is guilty of long and continuing misconduct [Arnold v. Arnold, Mo., 222 S.W. 996, 999(4); Garton v. Garton, Mo.App., 246 S.W.2d 832, 837(4); Lowe v. Lowe, Mo.App., 229 S.W.2d 7, 14(9); Scott v. Scott, 239 Mo.App.

953, 192 S.W.2d 668, 677(6)]. A fortiori, condonation may not be inferred or found in the instant case from plaintiff's sexual relations with defendant after January 4, 1952, when, as he put it, "I knew she was insane."[4] Mahurin v. Mahurin, Tex.Civ. App., 208 S.W. 558, 560(2).

 Although a suit for separate maintenance is a statutory action at law, it is sui generis, based upon equitable principles, and governed by equitable procedure [Wright v. Wright, 350 Mo. 325, 165 S.W. 2d 870, 873(2); Bingham v. Bingham, 325 Mo. 596, 29 S.W.2d 99, 101(1); Hoynes v. Hoynes, Mo.App., 218 S.W.2d 823, 827–828(1)], and "the court is required to weigh the equities between the parties as they are revealed by the evidence in each case" [Herbig v. Herbig, Mo.App., 245 S.W.2d 455, 457(4)]. While our appellate review is "upon both the law and the evidence as in suits of an equitable nature," we are enjoined that "the judgment shall not be set aside unless clearly erroneous" and that "due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses" [Section 510.310(4)]; and, although not bound by the findings of the trial judge, it has been stated repeatedly that the appellate court should not disturb such findings unless it can point to some good reason for doing so [Brooks v. Brooks, supra, 211 S.W.2d loc.cit. 68(2); Reeve v. Reeve, supra, 160 S.W.2d loc.cit. 807(3); Glick v. Glick, supra, 41 S.W.2d loc.cit. 626–627(5)]. With the foregoing principles in mind, we are constrained to conclude that the judgment for plaintiff should be affirmed. It is so ordered.

McDOWELL, P. J., concurs.

4. This holding is consistent with the well-established and long-recognized rule that acts committed while insane cannot constitute grounds for divorce [Crow v. Crow-Humphrey, 335 Mo. 636, 73 S.W.2d 807, 812(3); Niedergerke v. Niedergerke, Mo.App., 271 S.W.2d 204, 207(2); Fossett v. Fossett, Mo.App., 243 S.W.2d 625, 632(1); Bethel v. Bethel, 181 Mo.App. 601, 164 S.W. 682, 683–684(2); Annotation, 19 A.L.R.2d 144], for "(t)he in-

dignities that give rise to a cause of action for divorce must be intentionally committed" [Thomason v. Thomason, Mo.App., 262 S.W.2d 349, 352(4)] and "must be voluntary acts," not the acts of "one who was incapable of understanding their nature or of restraining himself from their commission" [Dunn v. Dunn, 240 Mo.App. 87, 216 S.W.2d 141, 143(4)].